JOHN H. GORDON, Admr.

*v.*

MARY A. ADAMS *et al.*

*Filed at Ottawa January 25, 1889.*

1. PROMISSORY NOTE—*delivery.* It is not indispensable to the delivery of a promissory note that it shall pass into the personal possession of the payee. If delivery is made to another for the payee, without condition, his acceptance of it may be presumed, and the delivery will be complete.

2. In determining the question of delivery in any case, the intention of the parties with respect thereof is the controlling element. This intention may be shown by direct proof, or by proof of the acts and declarations of the parties evincing such intent, or may be inferred from circumstances shown which are sufficient to create the presumption of delivery. Thus, if a deed or note is found in the possession of the grantee or payee, its delivery will be presumed.

3. In this case, upon a review of the evidence, it was not considered sufficient to establish the fact of delivery of certain promissory notes which were shown to have been executed.

WRIT OF ERROR to the Appellate Court for the Second District;—heard in that court on writ of error to the Circuit Court of Knox county; the Hon. ARTHUR A. SMITH, Judge, presiding.

Messrs. LANPHERE & BROWN, for the plaintiff in error:

When a note is shown to have been executed by a party, and is found out of his possession, every presumption of law is in favor of its delivery. 1 Parsons on Bills and Notes, 49; *Sinclair* v. *Baggally,* 4 M. & W. 312; *Anderson* v. *Weston,* 6 Bing. 296; *Roberts* v. *Bethell,* 12 C. B. 778.

A note is presumed to have been delivered on the day of its date. 1 Parsons on Bills and Notes, 49.

The holder of a promissory note is presumed to be the owner, and that he paid a valuable consideration for it. 1 Parsons on Bills and Notes, 51; *Burnap* v. *Cook,* 32 Ill. 168; *Farwell* v. *Meyer,* 35 id. 40.

The maker of a note must pay it to the person in whose hands it is found, unless he can prove that the holder came by it unlawfully. 1 Parsons on Bills and Notes, 50; *Griswold* v. *Davis*, 30 Vt. 390.

Delivery may be made to the payee or grantee, or to some one for him. *Rivard* v. *Walker*, 39 Ill. 413; *Thompson* v. *Candor*, 60 id. 244; *Bodley* v. *Higgins*, 73 id. 375.

Acceptance is necessary to a delivery, but the court will presume an acceptance when it can see that it is for the benefit of the payee to accept. *Taylor* v. *Davis*, 11 Ill. 10; *Reid* v. *Douthit*, 62 id. 348; *Rivard* v. *Walker*, 39 id. 413; *Masterson* v. *Cheek*, 23 id. 72; *Ferguson* v. *Miles*, 3 Gilm. 358.

Actual knowledge at the time, by the payee, of the delivery of a note to a party for him, is not necessary to the validity of the instrument or of its delivery. 1 Parsons on Bills and Notes, 154; *Morse* v. *Clayton*, 13 S. & M. 373; *Many* v. *East India Co.* 5 B. & A. 204.

The delivery of a note to A for the benefit of B is not an agency, but a trust and confidence, and the trust can be enforced by B. 1 Parsons on Contracts, 347; Burrill on Assignments, 589; 2 Bouvier's Law Dic. 407.

The note payable to Marion is valid, notwithstanding his minority. 1 Parsons on Contracts, 310; *Jancy* v. *Alden*, 12 Mass. 375; *Magee* v. *Magee*, 65 Ill. 255; *Holmes* v. *Holmes*, 44 id. 168; *Scott* v. *White*, 71 id. 287.

A valuable consideration for the relinquishment, by the parent, of the services of the son, is not necessary. *Holmes* v. *Holmes*, 44 Ill. 168; *Scott* v. *White*, 71 id. 287; 1 Parsons on Contracts, 310.

Messrs. McKENZIE & CALKINS, for the defendants in error:

There never was a delivery of the notes to the payees, or to Mrs. Gordon for their benefit, and such delivery was necessary to their validity. A note is not executed until delivered. *Hunt* v. *Weir*, 29 Ill. 83; *Hienterberger* v. *Weindler*, 2 Bradw. 410.

Delivery to the payee, either actual or constructive, is necessary. *Bank* v. *Strang,* 72 Ill. 559.

The delivery must be the act of the maker. If the payee obtains possession by fraud, or without the consent of the maker, he can not recover. *Carter* v. *McClintock,* 29 Mo. 464.

Leaving a check upon the desk of the clerk, without his knowledge, is not delivery to the clerk or his employer. Delivery is a thing in which both parties must join. The minds of both parties must concur. *Kinne* v. *Ford,* 52 Barb. 194.

A executed a promissory note, payable to B or order, but did not deliver it. Subsequently B took the note from the possession of A, against his previous direction, and without his knowledge, and put it into circulation : *Held,* that A was not liable thereon, even to a *bona fide* purchaser and holder. *Burson* v. *Huntington,* 21 Mich. 415 ; 4 Am. Rep. 497 ; *Thomas* v. *Watkins,* 16 Wis. 574.

Mr. JUSTICE SHOPE delivered the opinion of the Court :

The only question of importance arising on this record is one of fact,—that is, were the promissory notes sought to be collected from the estate of James A. Bundy, deceased, or either of them, executed by the said Bundy and delivered to the payees thereof, respectively, or to any one for them, or for their use. Upon careful consideration of all the evidence, we are inclined to hold that a preponderance thereof shows that they were severally executed by the said Bundy. The signature to each of the notes is testified by a number of witnesses, seemingly possessed of the requisite means of knowledge, to be in his handwriting ; and while there is some conflict upon this point, when this evidence is considered in connection with the circumstances shown to have existed about the time the notes purport to have been made, and the declarations of said Bundy that he made notes to his sons, it leaves little or no doubt of their execution by him.

15—127 ILL.

No discussion will be necessary of the points made, that the notes are without consideration, and that one of them had been altered materially after its execution, for, if it becomes necessary, it will be found that there was a sufficient consideration for each of said notes, and the alteration complained of, being the writing of the word "five" over the word "ten," so that the note would read for $5000 instead of $10,000, is sufficiently explained upon the face of the instrument itself, the original of which is properly certified to this court in the record.

The question presenting most difficulty is in respect of the delivery of the notes. It is conceded, as it must be, that neither of the two notes was delivered to the payees thereof personally, or that either thereof was, at any time, in their individual possession or control. It is not, however, indispensable to the delivery of a promissory note, that it should pass into the personal possession of the payee. If delivery is made to another, for the payee, without condition, his acceptance of it may be presumed, and the delivery of it will be complete. (*Thompson* v. *Candor*, 60 Ill. 244; *Bodley* v. *Higgins*, 73 id. 375.) In determining the question of delivery, the intention of the parties with respect thereof is the controlling element. This intention may be shown by direct proof, or by proof of the acts and declarations of the parties evincing such intent, or may be inferred from circumstances shown which are sufficient to create the presumption of delivery. Thus, if a deed or note is found in the possession of the grantee or payee, its delivery will be presumed. (Parsons on Bills and Notes, 49; *Masterson* v. *Cheek*, 23 Ill. 76; *Walker* v. *Walker*, 42 id. 311.) It is not here shown that either of these notes was ever in the possession of the payees, or either of them, or that they were ever delivered to any one for their use. It does appear, however, that in the summer of 1873, substantially five years after the maturity of the notes, they were found among the papers of Mrs. Gordon, a deceased daughter of the maker, and sister of the payees. There is no legitimate evidence showing, or

tending to show, how or when the notes came into possession of Mrs. Gordon, or for what purpose they were in her keeping. It is not shown that the payees ever lived with her, or at her house; nor, indeed, is there any circumstance or fact shown from which an inference could arise that she received the notes from the payees.

·The circumstances out of which it is claimed this indebtedness arose, and from which the inference of the delivery of these notes is mainly sought to be drawn, may be briefly stated. In 1853 James A. Bundy owned about eight hundred acres of land in Knox county, and his two sons, Milton and Marion, resided with him, the latter being under age. The record contains evidence tending to ·show that the father promised the sons, if they would go on and work faithfully in improving his land, he would give to each a quarter-section thereof; that the sons continued to work for their father until 1857, when the father sold all the lands, applying the proceeds to his own use; that much trouble and dissatisfaction were thereby produced in the family,—the mother taking the part of the sons; that the father tried to get the land back, but failing in this, it is. shown that he consulted with the witness Reynolds about giving the boys his obligation, payable in ten years. The witness testifies: "He said, if he could not get the farm back, he was · going to provide some other way by which they would get their· pay; but if he had to do that, he would do it in his own time and way. After he found he could not get the farm back, he asked me what way he had better fix it for the boys. He said he was going to fix it in some shape right away, and asked me what I thought about making an obligation to the boys, payable ten years after date." The witness gave his opinion; when the father, speaking of not getting the farm back, said: ˙ "I will do the next best thing,—make out notes for the boys." The witness further says: "Afterwards he told me he had made the notes as he told me;" and farther, "he always said he would put the notes in Rebecca's hands, (his then wife,)

and the boys couldn't have them for ten years." This witness also testifies, that the father said the boys had become reckless, and were trying to force him into measures, but he would show them that he would pay them in his own time and way; that he would not do anything until they became "settled down;" that he thought in ten years they would know something of the value of money.

The evidence tends to show that the sons were wild and dissipated. It is apparent, from the testimony, that the domestic trouble occasioned by the sale of the land ceased about the time of the date of these notes, and from that fact it is argued that the notes must have been delivered. The notes were dated August 22, 1858, for $5000 each, one payable to Milton and the other to Marion, ten years after date, without interest. It is shown that Mrs. Bundy, the mother, died in 1869, Marion in 1873, the father in 1875, and Milton in 1878. It is not shown when Mrs. Gordon died, but, as before stated, the notes were found in 1873, after her death, among her papers,—substantially five years after their maturity, and at least in the lifetime of the maker, and of Milton, the payee of one of the notes. It is shown that James A. Bundy had a farm in Missouri, where, for at least a portion of the time, one or the other of the sons lived. It is clear, that at least up to 1870 the sons drew considerable amounts from the father, in money or property, and the communication between them was apparently continuous and uninterrupted. It appears, that upon the marriage of the father, in 1870, with the defendant, now Mary A. West, ill-feeling and bitterness arose between the father and sons. In 1874, Milton brought suit against his father, and when asked by the father why he did it, and if he owed him anything, replied: "You don't owe me anything, but I am going to torment you as long as you live for marrying that woman. You made a will once, giving your property to your children, and now you have changed it, and given it all to your wife." In 1870, two years after these notes became

due, Marion told the witness Sanders he had nothing, but was to have the Missouri farm; and like conversations are, in substance, testified to by other witnesses.

Conceding that the notes were executed, as the maker is shown to have stated to Reynolds, it is apparent, from the declarations made to the same witness, that the father did not intend that his sons should have the control or power to dispose of said notes, for ten years, or until they had "settled down." There is no evidence to show that the notes were ever placed in the hands of his wife, Rebecca, and no inference to that effect can be drawn from the possession of Mrs. Gordon. It seems impossible, in view of the relations existing in the family, that if the notes had been in her possession, she would not, at least after their maturity, have delivered them to her sons, especially as the necessities of the sons were great, and they were, to a considerable extent, compelled to live on the bounty of their father. It is quite as probable that they were placed in Mrs. Gordon's hands by the father for purposes of his own, as that she obtained them from any other source. This would be entirely consistent with his statement that he intended to provide for the boys, but he would pay them in his own time and way. If it could be presumed that the notes were placed in the hands of Mrs. Gordon, or her mother, or other person, in *escrow*, there is no evidence showing the condition upon which they were to be delivered, or of performance of the condition, whatever it might be.

It is apparent that all these persons were living when the notes matured, including the mother of these boys; yet it is not shown or pretended that any claim was made by either of the sons, or by the mother, that there was any liability of the father to the sons on account thereof, or that, during the lifetime of any of these parties, it was claimed that such notes ever were made, or were in existence. Nor is it shown that the sons, or either of them, ever had any knowledge that the notes were made. Indeed, the contrary is quite apparent. It

is improbable that the sons would have taken no steps to obtain possession of the notes,—at least after their maturity,—and enforce the liability of their father thereon, if they had known of their existence. And especially is this so after the alienation growing out of the second marriage of their father, and in view of their own financial necessities, as disclosed in this record. It seems probable that the family troubles were settled by some arrangement, by which the father was to provide for the sons, and it may be that these notes were executed for that purpose. But it is evident that the father did not intend to lose control over the obligations he executed. By a delivery of the notes, the sons would have had absolute power to dispose of them. The fact that payment could not be enforced before their maturity would afford no protection against their transfer, and the squandering of the proceeds, which it is clearly apparent their father feared, and intended to avoid. Just what the father did to satisfy his wife and sons is not certainly shown, and it is quite as probable that the will spoken of by Milton may have healed the family dissension, as that peace was restored by the execution and delivery of these notes.

The execution and delivery of the notes is denied by sworn answer, and we are unable to say, from this record, that they are valid evidences of indebtedness. The burden being upon the complainant to establish the liability of the estate, it follows, that in our opinion, the decree of the circuit court dismissing the original bill was properly rendered.

The judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*

Mr. JUSTICE BAKER, having participated in the decision of this case in the Appellate Court, took no part in its consideration here.