THE NORTHERN TRUST COMPANY, Admr., *et al.* Plaintiffs in Error, *vs.* JOHN E. SWARTZ *et al.* Defendants in Error.

*Opinion filed October 20, 1923—Rehearing denied Dec. 6, 1923.*

1. GIFTS—*what does not amount to a condition precedent to the vesting of title.* A condition attached by the donor of certain bonds which she has by letter given to the donee, to the effect that if the time shall come when the donor may be unable to provide for her own needs the donee will do so and see that the donor is buried in the family burying lot, is not a condition precedent to the vesting of title but is a condition subsequent, and the title vests upon acceptance by the donee. (*Estate of Beatty* v. *Western College,* 177 Ill. 280, approved.)

2. SAME—*when acceptance of gift is presumed.* Acceptance of a gift is presumed where beneficial to the donee, and where the donee is already in possession as custodian for the donor no further delivery is necessary.

3. SAME—*when proof of manual delivery of bonds is not essential.* Where the owner of certain bonds, who has left the same in the hands of her brother-in-law for safe keeping, subsequently writes a letter giving certain of the bonds (describing them particularly) to the wife of such brother-in-law, "to hold in fee simple" and to be "placed direct in her hands," the gift to the wife is complete without proof of the manual delivery of such bonds by the husband to the wife.

4. SAME—*burden of proof is upon the party claiming donor was of unsound mind.* One who, after the donor's death, seeks to set aside a gift *inter vivos* by a bill in equity, alleging that the donor was mentally incompetent to make the gift, has the burden of proving such allegation.

THOMPSON, J., dissenting.

WRIT OF ERROR to the Second Branch Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. GEORGE FRED RUSH, Judge, presiding.

CARROLL J. LORD, for plaintiffs in error.

THOMAS E. D. BRADLEY, and M. D. DOLAN, for defendants in error.

Mr. CHIEF JUSTICE FARMER delivered the opinion of the court:

Complainants, the Northern Trust Company, administrator of the estate of Mary F. Swartz, and Julia F. Hughes and Edwin J. Fort, filed their bill in chancery against defendants, John E. Swartz, Cora A. Swartz, and John E. Swartz as administrator *de bonis non* with the will annexed of the estate of Thomas B. Swartz, to set aside certain gifts of personal property claimed by John E. and Cora A. Swartz, his wife, to have been made to them by Mary F. Swartz during her lifetime. The bill alleged the gifts were claimed by defendants by virtue of letters and correspondence written by Mrs. Swartz in her lifetime, which letters complainants averred were insufficient to vest title in defendants or either of them. The bill further alleged that Mrs. Swartz at the time she wrote the alleged letters was mentally incompetent to dispose of her property, which fact was known to defendants. Answers were filed denying the gifts were not complete gifts, and denying Mrs. Swartz was insane or mentally incompetent to dispose of her property. The cause was heard by the chancellor, who entered a decree setting aside the gifts on the ground that Mrs. Swartz was mentally incompetent to make valid disposition of the property, but the chancellor made no finding on the question whether, if she had been mentally competent to dispose of her property, the gifts were completed and valid gifts. Defendants appealed to the Appellate Court for the First District, and that court reversed the decree of the circuit court of Cook county and remanded the cause, with directions to dismiss the bill for want of equity. The Appellate Court held the evidence as to the mental incapacity of Mrs. Swartz to dispose of her property was insufficient to sustain the decree, and also held that the gifts were completed

and valid gifts.   On petition of the complainants this court granted a writ of *certiorari* and the cause is here for review. We will refer to the parties as complainants and defendants.

Some facts necessary to an understanding of the case are:   Thomas B. Swartz was the husband of Mary F. Swartz.   He was a doctor, and for several years, in addition to his medical practice, was associated with his brother, defendant John E. Swartz, in the conduct and management, as owners, of the business of the Phospho-Albumen Company.   The testimony tends to show the two brothers were very devoted to each other and their wives were very intimate and friendly.   Dr. and Mrs. Swartz had two children, both daughters.   In December, 1903, the daughters, then eighteen and fifteen years, respectively, lost their lives in the Iroquois Theatre fire.   At the same time a sister of Mrs. Swartz lost her life also.   Dr. Swartz died February 1, 1916, and by his will bequeathed the property in question, except three $1000 bonds, hereafter referred to, to his wife, provided she survived him and did not die from the same accident causing his death within one year after the date of his death.   In case she did not survive him, or if she died from the same accident causing his death within one year from the date of his death, after payment of his wife's debts and funeral expenses he authorized his wife's sister, Julia F. Hughes, to take from his house any furniture or bric-a-brac she desired, and all the rest and residue of his estate he gave to his brother, John.   If his wife survived him she was appointed executrix without bond.   In case she did not survive him John was named as executor. The will was admitted to probate and Mrs. Swartz was appointed executrix.   After her husband's death Mrs. Swartz continued to reside by herself in the apartment which had been occupied by herself and husband, until the early part of June, 1916.   She collected the amount due on a life insurance policy of her husband, and with the money purchased two Chicago City Railway bonds of $1000 each and

one Swift & Co. bond of $1000. On May 26 she deposited with John and his wife the property she had received from her husband as well as what she had bought with the life insurance money, and at the time made the following memorandum:

"*May 26.*—I, Mary F. Swartz, place in the hands of my brother, John E. Swartz, and wife, the estate of my deceased husband, Thomas B. Swartz, for use in his business if so desired and safe keeping."

The property deposited, and which is the subject of this litigation, consisted of twelve $1000 bonds and some cash. About the first of June her brother, complainant Edwin J. Fort, who resides in Brooklyn, New York, came to see Mrs. Swartz, and on June 2 she wrote John Swartz she was going home with her brother for the summer and gave him directions about the management of her apartment while she was gone. She asked John to send her $25 in addition to what he had given her the night before, asked him to pay her rent and collect $20 due her from a Mr. Gustin, and enclosed an order to Gustin to pay the money to John. After going to Brooklyn with her brother she wrote John and Cora several letters, and July 19 wrote the letter hereafter set out in full to Cora, giving her the three bonds she had purchased with her husband's life insurance money. July 24 she wrote the letter hereafter set out to John, giving to his wife, Cora, three other bonds described and the remainder of her property to John.

Two questions are raised by the assignment of errors: (1) Whether the letters of Mary F. Swartz to defendants were sufficient to pass title to defendants to the property; (2) whether the proof was sufficient to establish the mental incapacity of Mrs. Swartz when the alleged gifts were made. The trial court made no finding on the first question, but found in its decree that Mrs. Swartz did not possess sufficient mental capacity to make a valid disposition of her property. The Appellate Court reversed the decree and held

the evidence was sufficient to vest the title to the property by gift in defendants from Mrs. Swartz in her lifetime, and that the evidence did not support the decree that she was mentally incapable of making a valid disposition of her property.

It will be borne in mind that when the cash, bonds and other papers of Mrs. Swartz were placed by her in the custody of John Swartz they were placed there "for use in his business if so desired and safe keeping." This was the statement in writing of Mrs. Swartz under date of May 26, 1916. In the early part of the following June she went with her brother, Edwin J. Fort, to his home in Brooklyn, New York, and never again returned to Chicago. Two letters she wrote the defendants while in New York form the most material evidence from which the dispute arises whether title to the property passed to defendants as a gift *inter vivos.* One of the two letters referred to was dated July 19, 1916, and is as follows:

"*My Dear Sister Cora*—I send you this note for the reason that after careful and deliberate consideration I desire that the three one thousand dollar bonds,—two Chicago City Railway and one Swift,—which I own and which were bought with the life insurance which came to me at the death of my husband, the late Thomas B. Swartz, from the National Union, etc., be transferred to you, Cora E. Swartz, to have and to hold in fee simple forever. This policy was made payable direct to me, Mary F. Swartz, his wife, and so it seems to me is not a part of his estate but belongs to me. Trusting that this transfer can be legally made without my presence but on this order, and that it will be acceptable to you,

"I am, with sincere affection, your sister,

MARY F. SWARTZ, New York."

It seems clear Mrs. Swartz intended to and understood she was then giving and irrevocably passing the title to the bonds to Cora, for she expressed the hope that the transfer could be legally made on her letter and without her presence. July 24 she wrote John Swartz the following letter:

"HUNTINGTON, L. I., NEW YORK, *July 24, 1916.*

"*Dear Brother*—Since writing you the last time I have been thinking a great deal about the future and the disposition of my property. You may not know, but it is true, that since the death of our children the world has had few attractions for me but because of my dear husband I have kept up social relations to some extent; now that he has gone I have absolutely no desire to continue them at all. I have been thinking of taking a step that may not meet with your approval but which I have talked over with brother Ed and to which he expressed his entire approval, so it need not be a cause of any anxiety to you or your wife. My health is greatly improved,—in fact is better than for five years or more. It is my desire to work at something. This may seem strange to people who do not understand what I have had to endure the last twelve years. I believe that steady employment is the only panacea for such sorrows as mine have been. So long as I am well my needs are not great and I prefer to be unhampered. It was the desire of my husband to do for you and your wife in such a way as to insure you an independent living and provide for your future without robbing me. I did not quite understand it all at first, but after some thought I have concluded that the property that I placed with you for safekeeping before I left home might better be given to you and your wife outright, on one condition,—*i. e.,* that if the time should come when I am unable to provide for my own needs that you will do so and see to it that I am buried in the family lot in the place reserved for me between Irene and my husband.

"Believing that you will be more than willing to grant this, and in consideration of the fact that the Phospho-Albumen business was transferred in entirety to you, it is my desire that the three $1000 bonds which were bo't with the insurance from the National Union, which policy was made payable to me direct,—not to the estate,—said three bonds being the two Chicago City Railway and one Swift, each $1000 bonds, be given to your wife, Cora E. Swartz, in fee simple. In addition it is my desire that this be supplemented by the proceeds of three of the St. Lawrence Pulp and Lumber bonds, which mature February 1, 1917. The remainder of said property, the bulk of which is represented by six other $1000 bonds, is hereby given to you, John E. Swartz. In explanation I desire you to understand that since the marriage of your brother and myself my earnings by teaching in the public schools amounted to $3000 and more, therefore I have considered that amount as my own and not an inheritance from him, and since this amount, six thousand, represents the woman's portion, this much shall be placed direct in her hands.

"I am under no obligations to anyone in the world. All claims against the estate of my late husband have been paid, and I understand there is nothing to prevent my disposing of my own property in accordance with my own wishes, except that an accounting be made to the judge of the probate court on the 14th day of March, 1917.

"My large trunk, sewing machine and a few other articles which you have in your possession, please hold until further instructions. The clock ship to R. B. Hoag,—I have written to him in regard to it,—the remainder to J. E. Hoag.

"I do not yet know how long I shall be here but will let you know after a time.

"With love, your sister,    Mary F. Swartz,

Executrix of the estate of Thomas B. Swartz, deceased."

Cora Swartz replied to the letter written to her, July 25, as follows:

"*Mrs. Mary F. Swartz:*

"*Dear Sister Mary*—I received your little note yesterday, and to say that I was overwhelmed by your generosity is putting it very mildly. My first thought was that I could not accept such a magnificent present from you for fear that you might need it. Of course, it would be a very comfortable thing to have the feeling that I had a few thousands of my own in case anything happened to J. E., because if he were gone the business would go, too, and I would have nothing to keep me in my old age. After thinking the matter over I would like to put it in this way: that I will accept the present from you with the understanding that the bonds will not be sold or disposed of, and if at any time in the future you should need them, they will be returned to you intact, otherwise will be held for my personal use, and thank you a thousand times for your great kindness in the matter. The legal part of it J. E. will talk over with Judge Blake to-morrow and see if anything is necessary beyond your letter. * * *

"With lots of love, I am, as ever, your sister,

Cora A. Swartz."

John E. Swartz replied, July 29, to the letter written him, as follows:

"*Mrs. Mary F. Swartz, Brooklyn, N. Y.:*

"*Dear Sister*—I received your letter of the 24th, and to say that I was surprised is putting it mildly. I did not answer immediately, as I thought it best to think the matter over thoroughly and also get some competent advice on same before answering. I assure you that I appreciate your kindness and generosity very much, and after thinking the matter over and talking with Judge

Blake on it, I came to the conclusion that I could accept your offer and would comply fully with your wishes in the matter to the best of my ability, and will be only too glad to be able to do anything that I can for you in any way that will make you feel happier and at the same time will give you as little worry as possible. Judge Blake said he would fix up the papers according to your directions and wishes in the matter and would send them to you for your approval if you still thought that was the proper thing to do. At the same time I want you to understand that the securities and all property belonging to you will have my careful attention, and at any time that you may need any of it I will cheerfully turn same over to you. I will also agree to fulfill all your wishes, as said before, and at any time that you would like to see me or need any assistance in any way I would be very glad to come wherever you are and do the best I can to make you comfortable and happy. I will await your answer before having Judge Blake draw up such papers as he thinks are necessary for our mutual protection.

"We are nearly through with your apartment and will send you a report on same just as soon as I can get things straightened out. In the meantime, as I said before, I have close to a thousand dollars in the bank of your money. It is drawing three per cent interest, and if at any time you need any of this money, if you will kindly let me know when and how much, I will be pleased to send same to you. I want you to feel that in me you have a brother that will do anything for you that is possible to save you trouble and worry of any kind. * * *

"Again assuring you that Cora and I will do anything that we can to please you, and thanking you for your kindness to us, I am, as ever,      "Your affectionate brother,

JOHN E. SWARTZ."

Complainants contend that assuming Mary F. Swartz was of sound mind the gifts were not completed: (1) The correspondence is not sufficient to pass title to either defendant; (2) there was no adequate acceptance of the gift by either defendant; (3) there was no delivery of the subject matter of the gift to Cora Swartz during the lifetime of Mary F. Swartz. Mrs. Swartz's letters indicate she intended and believed she was by them giving the property outright to defendants, making but one condition or request in the letter to John Swartz: that if the time ever came when she could not provide for her own needs he would

309—38

do so and see to it that she was buried in the family burial lot. In that letter Mrs. Swartz said she desired to supplement the gift of three bonds she had made Cora Swartz with three other bonds described,—"this much shall be placed direct in her hands." There is no language in Mrs. Swartz's letters indicating an intention that the title to the property should not pass to defendants until they had entered into an agreement of some kind about her possible future support. No condition of any kind was attached to the gift to Cora. The Appellate Court correctly held that when bonds are delivered with intent to pass title, the donor reserving the right to look to the donee for the interest, the transaction will be sustained as an executed gift. In such cases the condition is not one that must or can be performed precedent to the passing of title but is in the nature of a condition subsequent. This subject received elaborate treatment by this court in *Estate of Beatty* v. *Western College,* 177 Ill. 280. In that case Mary Beatty had given the college three sums of money aggregating $6700. At the time of making the gifts the college gave her certificates stating the money was to be used to maintain the college and increase its facilities for Christian education, the money to be used as the board of trustees or executive committee may elect. In each of the certificates the college agreed to pay Mrs. Beatty every year during her natural life a certain sum, amounting to seven and one-half per cent on each of the respective amounts. After Mrs. Beatty's death the college filed a claim against her estate on a note for $7000 she had given the college. As a set-off her executor filed the certificates mentioned, and claimed there was no gift *in præsenti* of the money named in the certificates because of conditions connected with the gifts; that the gifts were not absolute, could have been revoked at any time by the donor and were revoked by her death. The court held that the requirement of the payment of annuities to Mrs. Beatty

did not make the gift to the college conditional or less abso-
lute than it would have been without the condition.   The
opinion is well considered and cites numerous authorities
which support it.   As we understand and construe Mrs.
Swartz's letter, she did not attach or intend to attach any
condition to the vesting of title in defendants.

Complainants contend John E. and Cora Swartz did not
accept the gifts of the property.   We have above set out
the letters of John and Cora in reply to the letter of Mrs.
Swartz giving them the property.   On that question the
Appellate Court said: "We regard the replies of Cora A.
Swartz and John E. Swartz to the letters of Mrs. Swartz
as unqualified acceptances of the gifts.   In these replies they
agree to the terms of the condition imposed on the gifts
by the donor and assure her that the property will be kept
intact and that they will meet any needs she may have,
and that the property will always be available for such pur-
poses."   As a matter of fact, no condition of any kind was
attached to the gift to Cora.

Counsel for complainants attaches much importance to
John E. Swartz's reply to Mrs. Swartz's letter making the
gift to him.   He said he accepted the gift and would com-
ply with her wishes to the best of his ability; that he had
talked the matter over with Judge Blake, who would pre-
pare papers according to her wishes in the matter and send
them to her for approval if she thought that was the best
thing to do.   He said he would await her answer before
having Judge Blake draw up the papers "he thinks are
necessary for our mutual protection."   It seems quite plain
that Mrs. Swartz did not contemplate or expect any papers
should be signed by John.   There is no language in her
letter from which it can be inferred she wished or expected
John to sign anything evidencing the gift or the terms on
which it was made.   She was not bargaining or negotiating
with defendants to settle upon the time of the gifts and
did not expect or require any agreement from them.   The

gifts were absolute, and she relied on John's honor to furnish her support if she became in need. John's reply only indicates that he desired to give her some writing acknowledging his obligation to her rather than let it rest in parol, but the acceptance of the gift was not dependent on the signing of any paper or agreement. None was ever prepared, as Mrs. Swartz in none of her subsequent letters referred to John's suggestion that if it met with her approval he would have Judge Blake prepare a paper. The property which was the subject of the gift was in John's possession as custodian for Mrs. Swartz at the time she wrote the letters making the gifts. No further delivery to him of the gift made him was necessary. He was already in possession, the gift was beneficial, and in the absence of an express acceptance it would be presumed. In *Barnes* v. *Banks,* 223 Ill. 352, Barnes wrote a letter to his daughter, Mary Banks, on her thirty-third birthday, saying he presented her with certain land described, which she was then in possession of. He failed to make the daughter a deed before his death and she filed a bill to enforce his agreement. It was contended by the executors of Barnes' will that the gift was not a completed one; that to complete it and pass the title it was necessary that possession must pass to the donee and that it must be irrevocable. There was no express acceptance by Mrs. Banks of the gift nor did her father ever attempt to revoke it. This court held the delivery of the letter to Mrs. Banks while she was in possession vested the equitable title in her, and enforced the agreement. The court said: "By the language of the writing the gift took effect and was complete immediately upon the delivery of the paper. The fact that appellee was in possession at the time the gift was made does not make the case different from what it would have been if she had not been in possession at that time but had been given the possession in pursuance of the gift." In *Scofield* v. *Olcott,* 120 Ill. 362, the court said: "An estate is vested when there is an im-

mediate right of present enjoyment or a present fixed right of future enjoyment. It gives a legal or equitable seizin."

It is argued that there is no competent evidence that John E. Swartz ever delivered the six bonds to his wife, and for that reason title never passed to her. John and Cora Swartz were permitted to testify on the trial, subject to complainants' objection, that the bonds were delivered to Cora by her husband. The Appellate Court correctly held they were not competent to testify on that subject, and there is therefore no proof that the bonds were delivered to Cora. It will be observed that in her letter of July 19 Mrs. Swartz wrote Cora she gave her the three bonds (then in possession of Cora's husband) which she had bought with money received from a life insurance policy of her husband, "to have and to hold in fee simple forever." In her letter of July 24 to John Swartz, Mrs. Swartz said she desired to supplement the gift of those bonds she had made Cora by the gift of three other bonds described, and the remainder of her property she gave to John. She explained why she gave Cora the six bonds, and said, "This much shall be placed direct in her hands." If Mrs. Swartz had been in possession of the bonds at the time and had delivered them to John with the same instructions, we are of opinion it would have passed the title to Cora.

In *Gordon* v. *Adams,* 127 Ill. 223, the question whether promissory notes of a father to two sons were delivered to the payees was considered. It was conceded the notes were never delivered to the payees personally and were never in their individual possession. The court said: "It is not, however, indispensable to the delivery of a promissory note that it should pass into the personal possession of the payee. If delivery is made to another for the payee, without condition, his acceptance of it may be presumed and the delivery of it will be complete. (*Thompson* v. *Candor,* 60 Ill. 244; *Bodley* v. *Higgins,* 73 id. 375.) In determining the question of delivery, the intention of the parties with re-

spect thereof is the controlling element. This intention may be shown by direct proof, or by proof of the acts and declarations of the parties evincing such intent, or may be inferred from circumstances shown which are sufficient to create the presumption of delivery."

It is well settled that a gift of personal property, to be valid, must take effect at once and be irrevocable. It is generally held there must be a change of possession as evidence tending to show intent to give. We have seen the property given Cora was in the possession of her husband, as custodian for Mrs. Swartz, when the gift was made. There can be no doubt Mrs. Swartz intended the gift to be complete. In *Taylor* v. *Harmison,* 179 Ill. 137, the court, in discussing the necessity of delivery of notes to the donees to pass title, said: "Such a delivery may be made to a third person for the donee, and if the delivery is absolute and unconditional, so that the gift takes effect at once, the assent of the donee may be implied." It seems clear to us that if Mrs. Swartz was of sound mind the gifts to both defendants, under the authorities, some of which we have referred to, were completed and valid gifts.

On the question of Mrs. Swartz's mental capacity the court heard the testimony of nineteen witnesses besides complainants,—seven for complainants and twelve for defendants. It is shown by the testimony that Mrs. Swartz was an educated, cultured and talented woman. Counsel for complainants does not claim she was insane generally, but contends that she was for a time after the death of her daughters a victim of melancholia and had insane delusions on certain subjects; that the last year of her life she suffered from a recurrence of the mental disease, and had insane delusions on the subject of money matters and the impelling necessity of giving her property to John and Cora Swartz. In 1904, a few months after the death of her children, she was sent by her husband, upon the advice of Dr. Stearns, to a sanitarium at Lake Geneva which was

conducted by Dr. Stearns, who specialized in mental and nervous diseases. The doctor described her condition as typical of acute melancholia. He testified she was at the Oakwoods Sanitarium,—a sanitarium for distinctly mental cases,—about a month, then went to the Lakeside Sanitarium, about a quarter of a mile away, where ordinary nervous cases were treated. The doctor saw her once a day and testified his diagnosis of acute melancholia was confirmed. He testified she kept aloof from others as much as possible, was quiet and responded with hesitation to inquiry. The expression of her face and posture of her body betokened great grief and anxiety. She talked about not having enough money to pay her bills and that she was ruining her husband financially. He said she was suicidal, but he could recollect nothing she said or did to make him believe that. She at times refused the efforts of nurses to take her out for a walk and exercise and at times refused food. She improved in every way before he removed her to Lakeside, and she only remained there a few days, when she was discharged and went home with her husband. After that the doctor saw her two or three times a year for the first year or two. He saw her after she and her husband returned from a trip to Alaska, which was in 1914, and she appeared perfectly normal. At another time he saw her and she was not normal but was reticent and showed a little bit of the stolidity she had when ill. That was the last time he saw her, and was before her husband's death. The doctor testified melancholia is a recurrent condition; that it might be caused by such a tragedy as the death of Mrs. Swartz's daughters in the Iroquois Theatre fire. The last time the doctor saw her he thought she was suffering from melancholia, but would not say acute melancholia. It is a disorder of the emotions, and delusions may or may not appear. Such patients are self-condemnatory and reproach themselves for imaginary things done in the past. The religious nature is more or less interfered

with and suicidal tendencies appear. Such patients have a tendency to wish to be quiet and alone. The doctor described other symptoms of patients so afflicted, and said men with that disease could go on with the conduct of their business; that some professional men with melancholia "continue with their business and practice." It is impossible to ascertain that a person is suffering from acute melancholia without a long investigation. In everything that does not concern the delusion the patient may be perfectly competent and normal. The doctor was not asked his opinion, from what he had seen of Mrs. Swartz, whether she was of sound mind in 1914, but in answer to a hypothetical question which covers four and a half printed pages of the abstract, he said that if the facts assumed in the question were true, in his opinion she was of unsound mind in July, 1916. The question was very liberal in its assumption of facts the evidence tended to show which it was claimed indicated insanity and omitted material facts appearing in the evidence tending to show Mrs. Swartz was sane. On cross-examination the doctor was asked if certain facts were proved in addition to those assumed in the hypothetical question, if he would still be of opinion Mrs. Swartz was of unsound mind, and answered he would.

The testimony of other witnesses upon the subject of Mrs. Swartz's mental capacity is too voluminous to set out. Three of her women friends and acquaintances testified they believed her of unsound mind and testified to the acts and conduct upon which they based their opinion. The testimony of other witnesses for complainants, except their own testimony, was about certain acts of Mrs. Swartz which it is contended were irrational and evidenced a diseased mind.

The testimony shows Mrs. Swartz, as we have said, was a woman of good education and possessed a rather high order of talent. She was a member of the Presbyterian church and took a prominent part in its activities. One of the complainants' witnesses testified she held about every

position in the church which a woman could hold.  She presided at meetings and sometimes read papers or made speeches.  She was greatly distressed and grieved at the tragic death of her daughters, which caused her great sadness.  Her husband thought it advisable for her to go to the Lake Geneva Sanitarium for a time, and she did so. She remained there a little over a month and was then discharged.  That she was never the same cheerful, happy woman after the tragic death of her daughters was not unnatural and of itself not evidence of an unsound mind.  It was but natural that the tragedy would affect her life ever afterwards.  Some time after leaving the sanitarium she resumed her activities in the church and other organizations she was interested in.  The circumstances related by the witnesses as impressing them she was of unsound mind were not sufficient, in view of the whole proof, to justify their conclusions or the decree of the circuit court.

Without attempting to set out the testimony in detail, we may refer to some of the facts related by the witnesses which induced them to believe Mrs. Swartz was not of sound mind.  She was never so cheerful after the death of her daughters.  When in the kitchen at the church, preparing lunches to serve the public, if she heard John Swartz had come for lunch she appeared to be excited.  At times she would start to say something and not finish the sentence or subject.  She would ask the women who were preparing sandwiches for lunches at the church to save the crumbs and would take the silverware belonging to the church home for safe keeping.  At one time she was asked to visit one of the witnesses on a certain day, and she said she could not do so because she had to spend the day in the cemetery. A Mr. Stevenson testified that in the summer of 1916 he received a letter from New York signed "Mary F. Swartz," simply saying, "Send me $500."  He testified he did not owe her anything, threw the letter in the wastebasket and did not reply, as he supposed she had money from her hus-

band's estate.   May 27, 1916, she telegraphed her brother asking if he would raise $8000 for her at six per cent interest, and the same day wired him $5000 would be sufficient.   On May 24 John E. Swartz wrote Fort that Mrs. Swartz had not been in good health for a week and on one or two days seemed "off" mentally; that he had asked Mrs. Hughes to come to her sister, but she had not done so.   He said he thought there was no immediate danger but wanted to post Fort, and would keep him informed. He said he thought if Fort would visit Mrs. Swartz, or write her inviting her to visit him, it would be a good thing. He said in his letter that the day he wrote she seemed all right; that he had had her family physician visit her, and the doctor said she was very much better but should not be left alone, and for that reason he said he wrote suggesting a visit by her to her brother.

Lester P. Hoag, a distant cousin of Mrs. Swartz, residing at Springfort, Michigan, testified for complainants by deposition.   Witness became acquainted with Mrs. Swartz when a little boy, while she was living with his grandfather's family.   The mother of Edwin J. Fort, Mrs. Hughes and Mrs. Swartz died when the children were young, and Edwin and Mrs. Swartz went to live in the family of an uncle and aunt while Mrs. Hughes and the other sister went to live with another uncle and aunt.   She visited the witness' father's home in 1916.   Witness never saw her very often after she left his grandfather's home. In 1916 his father received a communication from Mrs. Swartz, and witness went to Chicago to see her.   He visited her two or three days and talked with her four or five hours a day.   While visiting her he sent complainant Fort a telegram that Dr. Holmes and Judge Blake said Mrs. Swartz should be placed in a public or private asylum, and that Fort was the one to make the arrangements.   The telegram was dated May 29.   Afterwards he sent Fort another telegram, signed by himself and John Swartz, saying

Mrs. Swartz's mental condition was worse and they thought it necessary for Fort to come at once. Hoag testified that in his opinion Mrs. Swartz was of sound mind; that he did not believe it necessary to place her in an asylum; that his idea in sending the telegrams was to induce Fort to come to Chicago and "look after these affairs." It will be remembered Mrs. Swartz was living alone at that time. The witness testified the only thing Mrs. Swartz did or said which appeared to him irrational was, she asked him if his father would loan her money; that he thought if there was any question of her mental condition Fort was the one to look after her, and that was his reason for sending the telegrams.

Mrs. Swartz went to her brother's home in Brooklyn in the early part of June. On the 20th of June, without informing her brother, she left his house and engaged herself as housekeeper for Mr. and Mrs. Sammis, an aged couple, and worked there for wages until September 20. She had previously told her brother she was going into the city of New York to stop at the Martha Washington Hotel a few days and then return to Chicago. On the 23d day of June she wrote to John E. Swartz about certain business matters, and in the letter said her health was much improved and she thought it would be unfair to remain through the summer with her brother's family. She said she wanted to work, for it was the only panacea for her troubles, and she hoped John would approve her finding employment for the present. Much importance is attached to the circumstance of her taking employment as housekeeper for an old lady and her husband, and especially because she did not, before doing so, inform her brother. Fort testified that while at his house she talked with him about securing employment as matron in a hospital, or something of that kind, and that he promised to help her secure such a position. On June 29 she wrote her brother that she was staying with some fine old people who had

plenty of means and was pleasantly situated. Mrs. Sammis testified by deposition that Mrs. Swartz was a model housekeeper, did all her work intelligently and perfectly, was a perfect lady, never talked about her affairs and wrote and received many letters. On the 20th of September Mrs. Swartz told Mrs. Sammis she was going to Washington, D. C. The latter part of that month her body was found in the Potomac river, at Mt. Vernon. Shortly after September 20, 1916, John E. Swartz received a package containing some of her clothing, which was sent to him by express from Washington, D. C. In the package was an undated letter in which she referred to her deeds to a cemetery lot being in John's possession, and that she had hoped to put the lot "in perpetual care" but found she could not afford it. She expressed the wish that it be done some time. She said whatever she died possessed of "is given to you and your wife," which she stated was in accordance with an agreement between herself and husband made some years before; that her brother, Edwin J. Fort, did not need it, and "we consider" Mrs. Hughes has had her share in the assistance Mrs. Swartz and her husband had rendered her since the death of Mrs. Hughes' husband, and that she (Mrs. Swartz) had relinquished to Mrs. Hughes all claim in the estate of a deceased sister, who died in 1903. She directed that her children's pictures be destroyed; that all jewelry in John's possession be disposed of through Cora,— not to any of her (Mary's) own people, "that there may be no ban on them."

Mrs. Hughes testified that she did not see much of Mrs. Swartz during their younger days; that Mrs. Swartz was married in Michigan, where she was brought up, and after her marriage moved to Chicago. The two sisters had seen little of each other for several years, though for a considerable time they did not live very far apart. In May, 1916, in answer to a telegram from Mrs. Swartz, she went to her house in Chicago; that Mrs. Swartz had

previously telephoned her at Valparaiso, Indiana, where Mrs. Hughes lived, after midnight, asking her to mortgage her house for $5000 to loan to Mrs. Swartz; that when she visited Mrs. Swartz she asked the witness whether she had brought the $5000, and when witness told her she had not, Mrs. Swartz asked her to send her $50 when she returned home. Mrs. Hughes also testified she had five $1000 bonds which Dr. Swartz had in his possession during his lifetime, and that Mrs. Swartz asked her to take the bonds from Dr. Swartz's possession. Mrs. Swartz seems to have let Mrs. Hughes have $100 at one time for the education of Mrs. Hughes' children. The correspondence shows it was apparently a gift. Subsequently she asked Mrs. Hughes to re-pay the money, and in a letter written about it, exhibited impatience with her sister for not paying it.

Complainants contend the evidence shows Mrs. Swartz was under the delusion that Cora Swartz was in some kind of trouble, and that it was her imperative duty to give her property to John and Cora to help them. We think the evidence on that question is very slight and inconclusive. It appears from the will of Dr. Swartz that next to his wife it was his desire that his property should go to his brother, and it seems from the letters of Mrs. Swartz that wish of her husband's was the controlling motive in making the gift. We do not refer to conversations with John E. Swartz testified to by Edwin J. Fort after the death of Mrs. Swartz, for the reason that John and Cora deny the material parts of the conversations. Twelve witnesses, including a banker, two doctors, three lawyers and a school teacher, who were acquaintances of Dr. and Mrs. Swartz, most of whom saw Mrs. Swartz and talked with her frequently, testified that in their opinion she was entirely sane. Several of them were members of the same alumni association of the university where Mrs. Swartz was educated, and some of them testified to her attendance of the annual reunions at the university and her activity in the association.

Some were classmates of hers. All of the witnesses testified to frequent association with and ample opportunity for observing Mrs. Swartz's mental condition. She took an active interest in the alumni association, helped prepare programs and made speeches.

Defendants' witnesses testified that after the death of Mrs. Swartz's daughters she was saddened, but resumed her activities in the organizations she belonged to and that her mind was unaffected. Defendants introduced in evidence a booklet, being a printed copy of a paper read by Mrs. Swartz in January, 1907, before the Every Wednesday Club. The subject was, "The Development and Present Status of Scientific Thought." The paper shows Mrs. Swartz was a thinker and a woman of wide information.

Counsel for complainants, in an able and lengthy brief, has elaborated every circumstance which might by any possibility be thought to indicate that Mrs. Swartz was a victim of an insane delusion. It has been impossible to refer to each particular circumstance without lengthening this opinion, which is already too long. Mrs. Swartz was a prolific letter writer, and the record contains many letters written by her between June 2 and September 20, 1916, as well as some written at a prior date. We do not find the slightest evidence of insanity or an insane delusion in any of these letters. They are more than ordinarily intelligent and show Mrs. Swartz to have been a woman of excellent memory. We think the entire evidence shows her mental condition was remarkably sound in view of the tragic experiences through which she had passed. She and her husband were very devoted to each other, and the proof abundantly shows that they were both very much devoted and attached to John and Cora Swartz. The circumstances relied on to establish insanity, we think, were of too slight a character to justify any such conclusion. Mrs. Swartz knew her husband, next to her, desired his brother and brother's wife to have his property. It may be thought

that it was not wisdom in her to give the property to them at the time she did and in the manner she did, but that does not prove she was insane. The burden was on complainants to establish by the proof that her mental condition was so impaired as to render her unable to make a valid gift. We agree with the Appellate Court that the proof does not justify that conclusion.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*

Mr. JUSTICE THOMPSON, dissenting:

The gift to John Swartz was on condition that he would undertake to care for Mary Swartz if she became unable to care for herself. John consulted his attorney and wrote Mary that he thought he "could accept," and that his attorney would prepare papers for their "mutual protection." No agreement was signed by the parties and their minds never met. Her offer to give him the property on condition he would care for her was not accepted, and so title to the property did not pass from Mary to John.