gift was not inter vivos, but was made in contemplation of death, and hence was taxable; and (2) that, as the transfer of the securities was not attested by stock transfer tax stamps, it cannot be regarded as a valid transfer. The proof offered concerning the gift is both sufficient and of a character to entitle it to be classed as one inter vivos. Matter of Hendricks, 163 App. Div. 413, 148 N. Y. Supp. 511, affirmed by Court of Appeals, 214 N. Y. 613, 108 N. E. 1095.

[1, 2] As to the test applied by reason of the Stock Transfer Act, there is not sufficient proof on the record to show that the transfer was not accompanied by the imposition of stamps upon the securities. Moreover, if proper proof on this point had been produced, an objection to the reception of evidence as to the transfer would have been tenable. Matter of Ball, 161 App. Div. 87, 146 N. Y. Supp. 499. No objection of this kind was noted. I therefore find that the transfer of the said securities by the decedent to Jessie (Botts) Kenyon was a gift inter vivos, and, being such, was not liable for a transfer tax.

The appeal is dismissed, and the order fixing tax affirmed.

---

### In re MILLS' ESTATE.

(Supreme Court, Appellate Division, First Department. May 5, 1916.)

1. GIFTS ☞20—INTER VIVOS—DELIVERY—PROPERTY IN POSSESSION OF DONEE.
   Where a father, while in California, in pursuance of an intention to make gifts to his son and daughter, who were with him, instructed his bookkeeper in New York to credit each with $1,000,000 and charge each with 8,000 shares of certain stock, which was in the exclusive possession of the son, who had a general power of attorney and stock power of attorney from the father, although some of the certificates were unindorsed, there was a sufficient delivery of the stock to the son to support a gift inter vivos.

   [Ed. Note.—For other cases, see Gifts, Cent. Dig. §§ 35; Dec. Dig. ☞20.]

2. GIFTS ☞29—INTER VIVOS—DELIVERY TO A THIRD PERSON FOR DONEE.
   There was a sufficient delivery of the stock to the son for the benefit of the daughter to support a gift inter vivos to the daughter of the stock charged to her account.

   [Ed. Note.—For other cases, see Gifts, Cent. Dig. § 50; Dec. Dig. ☞29.]

3. GIFTS ☞19(1)—INTER VIVOS—DELIVERY—NECESSITY.
   As no entries were made upon the books showing actual payment of the remainder, $16,000, necessary to make up a value of $2,000,000, a completed gift inter vivos of the $16,000 was not shown.

   [Ed. Note.—For other cases, see Gifts, Cent. Dig. § 34; Dec. Dig. ☞19(1).]

4. TAXATION ☞900(5)—TRANSFER TAX—REVIEW—MOTION TO STRIKE.
   In a proceeding to assess a transfer tax, where there was no evidence before the appraiser whether stock transfer stamps were affixed to stock given by deceased to his son and daughter, and no objection on this ground was made before the appraiser, a motion first made on appeal

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

to the surrogate to strike out evidence as to the gifts inter vivos was properly denied.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 1722, 1723; Dec. Dig. ☞900(5).]

5. TAXATION ☞533, New, vol. 11 Key-No. Series—STOCK TRANSFERS—TRANSFER TAX.

In a proceeding to assess a transfer tax, the only question being whether title to stock, subject of an alleged gift inter vivos by the deceased, passed to his donee, there being no provision of the transfer tax law which prevents passing of title to stock bearing no transfer tax stamps, the presence or absence of stamps was immaterial.

Scott, J., dissenting.

Appeal from Surrogate's Court, New York County.

In the matter of the transfer tax on the estate of Darius Ogden Mills, deceased. From an order fixing the transfer tax, the State Comptroller appeals. Order modified and affirmed.

Argued before CLARKE, P. J., and McLAUGHLIN, SCOTT, SMITH, and DAVIS, JJ.

Schuyler C. Carlton, of New York City, for appellant.

Francis Lynde Stetson, of New York City, for respondents.

DAVIS, J. Darius Ogden Mills, a resident of New York City, died in California on January 3, 1910. In a proceeding to assess the value of his estate for the purpose of fixing the transfer tax, the appraiser did not include in his appraisal certain property claimed by the respondents to have been given by the decedent during his lifetime to his daughter, Mrs. Reid, and to his son, Ogden Mills. There was an appeal to the surrogate, who denied the appeal and affirmed the appraisal. This is an appeal by the state comptroller from the order of the surrogate affirming the appraisal. There is no question here of any attempt to make a transfer to evade the transfer tax law. The appellant simply claims that there was no completed gift to the son and daughter, and that therefore the property in question is still in the estate and subject to the tax.

The point to be decided is whether, before his death, Mr. Mills had parted with ownership of the property in question, which consisted of 16,000 shares of the capital stock of the Atchison, Topeka & Santa Fé Railway Company of the value of $1,984,000, and $16,000 in cash. It is conceded that Mr. Mills intended to make the gift in question, but the appellant claims that he did not legally carry out that intention. The respondent claims the contrary.

For five years before his death the decedent had given his son and daughter a Christmas present of $1,000,000 each. On December 14, 1909, Mr. Mills, then in California, dictated to his daughter, Mrs. Reid, a letter to his son, Ogden Mills, then in New York, containing the following, among other things:

"I want to give you and your sister, for your Christmas present, or end of the year, $1,000,000 each. I think perhaps the best way to do it is to

give you each 8,000 shares of Atchison, making up any difference by check. When you come out, I think you had better bring this stock with you for my signature, so that your names can be carried in the regular way on the Atchison books."

Before this letter reached New York, Ogden Mills had left New York on his way to California. However, the letter was opened and read by the decedent's bookkeeper in New York, who thereupon wrote the following letter to Ogden Mills in California:

"December 20, 1909.

"Dear Mr. Mills: The letter from your father to you under date of December 14th was received this morning, in which he desires the usual entries to be made out, $1,000,000 each to Mrs. Reid and yourself. He thought perhaps the best way would be to give you each 8,000 shares of Atchison common and a check for any difference. I have just written him that I would charge profit and loss and credit Mrs. Reid and yourself with $1,000,000 each, then charge you each with 8,000 shares of Atchison common at market price. I have written him there would be sufficient funds in dividends and interest accruing the 1st of the month to make up any difference there might be. Further, I suppose these Christmas gift entries are usually made on the last day of the year, and I presume his intention is the same as indicated in this letter. After consulting with your father you find he wishes the entries made in a different way, kindly wire me. Everything is going along smoothly in the office. Compliments of the season from the office.

"Sincerely yours,                    .          George W. Graff.
"Mr. Ogden Mills."

It will be observed that the bookkeeper as yet had made no entry of the transaction upon decedent's books, doubtless because he had not received specific instructions to do so. These instructions came in a letter to the bookkeeper, written by Ogden Mills at his father's dictation and signed by his father December 24, 1909. This letter was mailed at the .decedent's direction, and was received by the bookkeeper. The bookkeeper's letter of December 20, 1909, was received in California by Ogden Mills and by him shown to his father. Thereupon with his father's approval he sent to the bookkeeper this telegram:

"December 30, 1909.

"George W. Graff, 15 Broad Street, Mills Building, New York. Charge up Atchison as indicated your letter 20th. I leave Saturday."

This telegram was received by the bookkeeper, and in obedience to the instructions he made entries upon decedent's books, charging profit and loss account with $2,000,000, and crediting Mrs. Reid and Ogden Mills each with $1,000,000, and charging each with 8,000 shares of Atchison common at the market price.

The appellant contends that these entries amount to no more than an acknowledgment by the father of an indebtedness, and in no way constituted a delivery to the son. We think this view fails to take into account the fact that none of these entries was made until after the interview in California between decedent and his children, in which it is claimed the gifts were made. This fact has great significance in the peculiar circumstances of this case, because it leads to the natural

inference that the entries recorded something already done by Mr. Mills, and not something yet to be done, such as the future payment of an indebtedness to his son and daughter. If Mr. Mills' bookkeeper merely had credited the accounts of the son and daughter each with $1,000,000 as a gift, and made no other entry, it would, of course, indicate a mere indebtedness—a right to draw upon Mr. Mills for $2,-000,000, as claimed by appellant. But the whole character of the accounts was changed when, under instruction of Mr. Mills, the accounts were each charged with 8,000 shares of stock. The indebtedness was then discharged (except $16,000), and the accounts closed to that extent. In other words, on the face of the accounts it appeared that Mr. Mills had paid in greater part the $1,000,000 to each child by giving each 8,000 shares of stock. Any one examining this account would have concluded that on December 31, 1909, Mr. Mills had delivered to his son and daughter 16,000 shares of stock at the price stated, in part payment of their credit balance of $2,000,000.

The appellant claims that Mr. Mills' letter of December 24, 1909, indicates that it was his intention to make delivery of the gift of stock after his son's return to New York. Mr. Mills wrote:

"I propose when Mr. Ogden Mills gets on to pay them with Atchison stock (common). * * * It will only need the cross entries. The adjustment of different values can be left until my return."

In this letter Mr. Mills gives no instruction as to charging his children's accounts with the stock. His sole instruction is to credit their accounts each with $1,000,000 and to debit his own account with like amounts, evidently intending that the stock entries should not be made until Mr. Ogden Mills gets on to New York. Standing alone, this letter would seem to lend support to appellant's view. But this letter must be read in connection with the telegram of December 30, 1910, sent to the bookkeeper by direction of Mr. Mills, instructing him to charge up Atchison as indicated in the bookkeeper's letter of the 20th of December, 1909, because they both refer to the same important matter.

Assuming, then, that it was Mr. Mills' original purpose not to complete the transaction until his son arrived in New York, this telegram shows clearly that he abandoned that intention and decided to complete the gift in California, and direct his bookkeeper to record the completed transaction upon his books by charging the accounts with the shares of stock. We may assume properly that Mr. Mills understood the meaning and effect of these entries directed by him; they are inconsistent with any hypothesis, except that of a delivery of the stock to the son and daughter and a complete surrender of dominion over them.

There are other facts in the case which, when considered in connection with the entries made at the direction of the decedent, show conclusively that Mr. Mills parted with title to this stock. At the time he dictated the letter of December 14th, the stock in question was already in the exclusive possession of Ogden Mills, and kept by him in the safe deposit vaults of the New York Stock Exchange. About a

year before his death Mr. Mills had transferred this vault to the name of his son. The decedent had no right of access to the vault. This appears from the testimony of the secretary of the Stock Exchange. In the vault were 22,310 shares of Atchison common, of which 7,500 shares were indorsed in blank, and the remainder were in the name of Mr. Mills and unindorsed. Moreover, Ogden Mills held a general power of attorney from his father, giving him complete control over his father's business and property. He also held a stock power of attorney, giving him like control over the disposition of his father's securities.

Unless the law demanded as a prerequisite of the gifts that Mr. Mills should have physically handed the stock to his son and daughter, we think there was abundant proof of gifts inter vivos. In the case of Champney v. Blanchard, 39 N. Y. 111, at page 116, the court say:

"Delivery of the subject-matter is, no doubt, essential to a gift, either inter vivos or mortis causa; but the object of delivery is to give possession, and in this case possession was already complete in the donee. No further delivery was necessary, nor was it possible, without first returning the property to the donor, that it might be redelivered to the donee, an idle and unmeaning ceremony."

In the case at bar the securities were already in the possession of the son. No further delivery was possible, unless the securities were brought from New York to California and given to Mr. Mills, to be redelivered to the son and daughter. This certainly would be "an idle and unmeaning ceremony," especially in this case, where the intention to give and the fact of giving are so clearly shown. In the case of Porter v. Gardner, 60 Hun, 571, at page 575, 15 N. Y. Supp. 398, at page 400, the court say:

"If the article given is at the time in the custody of the donee, the declarations of the donor to the effect that the donee is absolute owner, and characterizing the possession of the donee as absolute, will authorize the inference of complete delivery by the donor."

The order to the bookkeeper to credit the account of his children with $1,000,000 each, and then to charge them each with 8,000 shares of Atchison common stock, was a declaration on the part of Mr. Mills that he had parted with these shares and that they were owned by his children. The courts of other states have held that a manual delivery is not necessary when the intended donee is already in possession. Providence Inst. for Savings v. Taft, 14 R. I. 502, Tenbrook v. Brown, 17 Ind. 410, 413; Wing, Ex'r, v. Merchants, 57 Me. 383. The case of McGavic v. Cossum, 72 App. Div. 35, 76 N. Y. Supp. 305, is authority for holding that actual physical delivery of the property is not essential to a valid gift inter vivos. The case was decided upon submission under section 1279 of the Code of Civil Procedure. Among other things the court say:

" * * * we are of opinion that what was done constituted a good gift inter vivos. Actual delivery, by reason of the illness of the owner of the bonds, and their possession at that time by the bank, was physically impossible; but there was present, as evidenced by the writing of the deceased, not

only the intention to then give, but also the intention to then deliver the thing given. The owner did all he could do in this respect. It was a good constructive or symbolical delivery, and this, under the circumstances, was sufficient to vest good title in the plaintiff."

[1] So, in the case at bar, actual delivery was impossible because the securities were 3,000 miles away, and the intention to make and deliver a present gift is clearly shown. In addition to this, the securities were already in possession of one of the donees, and no further act of Mr. Mills could make his possession more complete. Although some of these certificates were unindorsed, the title nevertheless passed to the donees. Gilkinson v. Third Ave. R. R. Co., 47 App. Div. 471, 476, 63 N. Y. Supp. 792. At the time the gift was made the son and daughter were with Mr. Mills; the time for making the usual Christmas gift to them had arrived, and he gave them to understand that henceforth the title to those securities was in them, and in order to make it quite definite that he had parted with ownership in the securities he directed that his books show that fact by charging his son and daughter each with 8,000 shares. Both Mrs. Reid and Ogden Mills understood at the time that the stock had been given to them.

[2] The gift to Mrs. Reid should be sustained upon the principle that the delivery was made to Ogden Mills for her benefit and that thenceforth he held the securities as her trustee. Delivery to a third person for the benefit of another is sufficient to support a gift inter vivos. In the case of Bray v. O'Rourke, 89 App. Div. 400–402, 85 N. Y. Supp. 907, the court quote with approval from Thornton on Gifts and Advancements as follows:

"But a delivery need not be made to the donee in person; it may be made to a third person for him, even without the knowledge of the latter. The delivery must be made to such third person for the use of the donee, and if it is made 'under such circumstances as indicate that the donee (sic) relinquishes all right to the possession or control of the thing given, and intends to vest a present title in the donee, the gift will be sustained.' "

See also Bump v. Pratt, 84 Hun, 201, 204, 32 N. Y. Supp. 538; Hunter v. Hunter, 19 Barb. 631, 638.

It would have been a useless ceremony for Mr. Mills to require his son to deliver him the securities, and then for Mr. Mills to redeliver them to the son for the use and benefit of Mrs. Reid. Instead of going through that idle form, he adopted the only practicable way possible under the existing conditions, and allowed the securities to remain in the possession of his son for delivery to Mrs. Reid. Caylor v. Caylor's Estate (1899) 22 Ind. App. 666, 52 N. E. 465, 72 Am. St. Rep. 331.

We think it is conclusively shown by the record in this case that the donor, Mr. Mills, parted with dominion over this stock to his son and daughter and placed it beyond his power to resume control, had he wished to do so. As to him, the title to the stock was irrevocably in the son and daughter, and there was a valid gift of the stock inter vivos.

[3] While there is sufficient proof of gifts inter vivos of the shares of stock, the same cannot be said of the $16,000, the amount required to make up a value of $2,000,000. No entries were made upon his books showing actual payment of this amount until after the death of Mr. Mills. In the case of Ogden Mills, there was a reduction in his indebtedness to the estate to the extent of $8,000, and in the case of Mrs. Reid, her account was charged with $8,000, thus showing that her gift of $1,000,000 had been paid in full by the delivery of the 8,000 shares of stock before the death of Mr. Mills, and thereafter by the payment of $8,000 in money. Therefore, as to this amount of $16,-000, a completed gift inter vivos has not been shown.

[4] It is claimed by the appellant that all evidence as to the gifts inter vivos should have been stricken out by the surrogate on the ground that no stock transfer stamps were affixed at the time of the gift. This motion was first made on appeal to the surrogate. The record discloses no evidence on this point one way or the other before the appraiser, and no objection on this ground was made before the appraiser. For these reasons the motion was properly denied. Matter of Cleveland, 158 N. Y. Supp. 1099, affirmed without opinion 155 N. Y. Supp. 1098.

[5] Moreover, there is no provision of the Transfer Tax Law which prevents passing of title to stock bearing no transfer tax stamps. In the proceeding at bar, the only question before the court was whether or not title to the stock had passed. The presence or absence of stamps was therefore altogether immaterial.

The order of the surrogate is modified, by including in the taxable property the $16,000 paid to children of Mr. Mills after his death, and, as modified, affirmed.

Order modified, as directed in opinion, and, as modified, affirmed, without costs.

CLARKE, P. J., and McLAUGHLIN and SMITH, JJ., concur. SCOTT, J., dissents.