BURT v. SECOND NATIONAL BANK OF SAGINAW.

1. GIFTS—DONOR'S INTENT CONTROLLING AS TO WHEN GIFT BECAME EFFECTIVE.

In a suit by a son against the trustee of his father's estate for an accounting, where the crucial question is as to when the father's gift to the son of a cement plant became effective, the intent of the donor, if ascertainable, should control.

2. SAME—EVIDENCE HELD TO SHOW INTENT OF DONOR AS TO WHEN GIFT BECAME EFFECTIVE.

On the issue as to when a gift by a father to his son of a cement plant became effective, evidence held, sufficient to show that it was the father's intent that title should pass on December 31, 1914, although there are certain items of proof inconsistent therewith, explainable by the fact of the relationship existing between the donee and the donor, and the latter's anxiety to aid the son and make the business a success.

3. SAME—POSSESSION BY DONEE—DELIVERY.

Where the donee had possession of the intended gift, to show delivery, it is only necessary to show that the donor relinquished dominion over the thing given, and recognized the possession of the donee as being in his own right.

4. EXECUTORS AND ADMINISTRATORS—EQUITY—FRAUD—EQUITY HAS JURISDICTION WHERE PRESENTATION OF CLAIM PREVENTED BY FRAUD.

Where a son, by the fraud of one appointed by the father's will to assist the trustee of the estate and to give to the son information in regard thereto, was prevented from presenting to the commissioners on claims a just claim against the father's estate, the equity court is justified in entertaining jurisdiction in a suit against the trustee for an accounting, although ordinarily the claim would be barred under 3 Comp. Laws 1915, § 13875, because not presented before the estate was closed.

Appeal from Calhoun; North (Walter H.), J.    Sub-

¹Gifts, 28 C. J. § 42 (Anno); ²Id., 28 C. J. § 82 (Anno); ³Id., 28 C. J. § 28; 12 R. C. L. 1514; 4 R. C. L. Supp. 778; 5 R. C. L. Supp. 665; ⁴Executors and Administrators, 24 C. J. § 1022.

mitted April 20, 1927.     (Docket No. 10.)     Decided January 3, 1928.

Bill by George R. Burt against the Second National Bank of Saginaw, trustee of the estate of Wellington R. Burt, deceased, for an accounting.     From a decree for plaintiff, both parties appeal.     Modified and affirmed.

*Leland H. Sabin* and *Bernard J. Onen,* for plaintiff.

*Thomas G. Long, William L. Carpenter,* and *Humphrey, Grant & Henry,* for defendant.

BIRD, J.     This equity suit involves dealings between Wellington R. Burt of Saginaw and his son, George R. Burt.     Wellington R. Burt passed away in March, 1919.     By will he appointed defendant as trustee of his estate.     He also designated William T. Otis, many years his private secretary, to assist the trustee.     In the year 1903 Wellington R. Burt purchased land in the vicinity of Bellevue, suitable for the manufacture of cement, and in 1904 he commenced the construction of a cement manufacturing plant.     Early in 1906 he had it in operation.     He gave the management of it to his son George.     He told members of his family he was building the cement plant for George. George continued to manage the plant, and in February, 1911, Mr. Burt executed a deed to him of all the real estate owned by him in connection with the cement plant for a consideration of $200,000, and other considerations, and gave it to his secretary, Mr. Otis, and he placed it among the title papers of the cement plant in Mr. Burt's vault, where it remained until some time in 1914.

On March 20, 1914, Mr. Burt executed a bill of sale to George of all the personal property belonging to the cement plant, for a stated consideration of $93,150. On that date Mr. Burt's books showed his investment

in the cement plant to be $1,093,150.    The bill of sale provided that the $93,150 should be paid "out of the personal property sold from the premises."    On the bill of sale appears the following indorsement signed by Mr. Burt:

"November 27, 1914.
"Amount due on the within bill of sale $4,000—
"Balance paid in full.
"W. R. BURT."

Also, the following indorsement:

"December 2, 1915.
"Paid in full.
"W. R. BURT."

After the execution of the bill of sale Mr. Burt delivered it to Otis, his secretary, and he placed it with the deed and title papers of the cement plant in Mr. Burt's vault.    The papers remained there until the foregoing indorsements were made thereon on December 2, 1915, when Otis placed the deed and bill of sale in a tin box belonging to himself and George jointly, and in which they both had some bonds.    The box was kept locked, Otis had one key and George had the other.    Mr. Burt had no key to the box, but he knew of it.

On December 31, 1914, the following entry was made upon Mr. Burt's books:

"The amount charged against the plant as cost now totaling over one million dollars charged against profit and loss, to an amount of one million dollars per order of W. R. Burt.    Property has already been deeded to G. R. Burt.    Balance of account is charged to G. R. Burt's account."

On the same date this entry was made upon his books G. R. Burt was debited $4,000, and the Burt Portland Cement Company credited $4,000, with this memoranda in connection:

"Balance Cement Company account as ordered by W. R. Burt, account of personal property."

On this date, namely, the 31st day of December, 1914, Mr. Burt's books showed his investment in the plant to be $1,004,000. These entries closed the cement company's account, and the unpaid balance of $4,000 on the $93,150 was charged to George's personal account.

The plant was located in a small village where the banking facilities were very limited. So, from the beginning, George used his father as his banker. When he received remittances for his product he mailed them to his father, and when he needed cash he would draw on him. This practice continued up to the time of Mr. Burt's death.

It is George's claim that the title to the plant passed to him on December 31, 1914. His claim is that his father intended to make him a present of an investment of $1,000,000; that when his investment got to that point the title should pass to him. On that date he owed his father a balance of $4,000, which had been credited to the cement plant and charged to him personally.

On August 14, 1915, his father's books showed that he had paid this balance. After this date he deposited with his father $125,000 more than he withdrew, and his claim is that the estate should now reimburse him in that amount.

The defendant insists that the title did not pass to George until January 9, 1918, when Mr. Burt wrote George as follows:

"I am inclosing you deed for all the land at Bellevue, including the plant, which I wish you would put on record at once. I have concluded this is the best way, and then for you to make the income tax return for the present year as to you and so report it. Instead of reporting the employees at the plant who have received $800 or more (as required by the law) by him,

you will report them direct.      I want to see this report before you send it in."

That inasmuch as George did not get title to the plant until January 9, 1918, all the remittances that went forward to the father prior to that date belonged to his father and not to him.

1. In most cases involving the question of gifts, the crucial question is, "Was there a legal gift?" That question is not involved here. The question here is, "When was the gift made?" It seems to be conceded that Wellington R. Burt built the plant for his son George. He so advised members of his family, and stated to them that when his investment in the cement plant was reduced to a million dollars he was going to give it to George. It is conceded that he *did* give it to George, but just *when* is the main question discussed. Plaintiff claims title passed to him on December 31, 1914, when the consideration of the bill of sale was paid. Defendant claims it did not pass until January 9, 1918. If this were an action at law, and the question was to be disposed of on purely legal grounds, it is quite possible we might not agree with either of the contentions. This, however, is an equitable proceeding, and we think we should try to ascertain, if possible, the time when the donor intended the title to pass, and then carry it out as he intended it.

That Wellington R. Burt built the plant for George and intended to pass title to him when his investment reached the point of a million dollars appears to admit of no doubt. He took the first step towards transferring it in 1911. He executed a deed of the plant and filed it away among the title papers of the cement plant. Early in 1914 his investment had been reduced to $1,093,150. He then made a bill of sale of the personalty connected with the plant, for a consideration of $93,150, and filed it away with the deed.

On December 31, 1914, the $93,150 had been reduced to $4,000.     When the balance had reached this point Mr. Burt was evidently anxious to close the matter up because his books show that on that day he credited the cement plant with the $4,000 that was due on the bill of sale, and charged it to George personally.     On the same day he charged off to profit and loss one million dollars, and caused the following entries to be made on his books:

"Dec. 31, 1914, W. R. Burt, Stock a/c Amount charged against plant as cost now totaling over one million dollars charged Profit & Loss to the amount of $1,000,000.00 per order W. R. Burt.     Property has already been deeded to G. R. Burt.     The balance of the a/c is charged to G. R. Burt's a/c 4,000.

"G. R. Burt.     To balance Cement Co. a/c as ordered by W. R. Burt a/c personal property 4,000.

"Burt Portland Cement Co. 1,004,000.

"Dec. 31, Burt Portland Cement Co. given G. R. Burt, $1,000,000."

December 31, 1914, appears to us as the date Mr. Burt intended the title to pass, or not later than August 13, 1915, when the balance of the $4,000 was paid by George in full.     Some of the items of proof which have influenced us to this conclusion are:

(*a*) The entry on Mr. Burt's books under date of December 31, 1914, that the property had been deeded to George.

(*b*) On December 31, 1914, Mr. Burt's investment in the plant was reduced to a million dollars.

(*c*) On August 26, 1915, two weeks after George had paid the $4,000, he and his wife visited Mr. Burt on the event of his birthday.     Mr. Burt greeted Nellie (George's wife) as follows:

"Well, Nell, I suppose you are feeling pretty rich now that your husband owns the cement plant?"

(*d*) Mrs. Marion Burt Beck, a daughter of Wellington R. Burt, visited him the latter part of 1915, or early in 1916, and she testified that:

"He told me—he told me a great many times that he intended to give it to my brother, and later told me that he had done so."

(e) His niece, Mrs. Martha Colby, testified that while visiting at his home Mr. Burt said, in speaking of the cement plant:

" 'It has cost me a million dollars to make it a paying proposition, and I have given it to George. He realized responsibility—business responsibility. It is for him to manage, and I am most happy to say'—and he certainly expressed it very feelingly, 'that George is making a perfect success of it, a fine business man.' It was a great joy to him." (This conversation occurred in July, 1915.)

(f) Mrs. Martha Colby Day, a daughter of the last witness, testified about having a conversation with Mr. Burt in July, 1915:

"He was speaking of the farm and the developments there, and said: 'Of course, I gave the plant to George,' and he said, 'I am pleased with the way he is running it, and with the success he is making.'"

(g) In 1917 additional land adjoining the cement plant was purchased, and Mr. Burt advised George to take the title in his own name.

(h) George paid the Federal income tax on the plant for the year 1917.

(i) After December 31, 1914, Mr. Burt spoke of the plant as "your plant" and the moneys deposited as "your moneys" to George and his wife.

These items, taken in connection with the entries on Mr. Burt's books, are persuasive that he intended the title should pass to George on December 31, 1914, at the time his investment had been reduced to a million dollars.

Our attention is called to several items of proof which are inconsistent with this theory. This is equally true of the date suggested by defendant. And if the dealings had taken place between strangers they would be very persuasive. Mr. Burt, however, in dealing with a favored son, to whom he was giving a million dollar plant, was giving no particular thought

to a legal delivery.   He had made the deed and bill
of sale of the plant to George, and, doubtless, he con-
sidered that a sufficient transfer when his investment
was reduced to a million dollars.    Mr. Burt was a
very wealthy man and a very keen business man.    He
was very fond of his son George.   He desired to get
him established in business before he passed away.
He created this plant, and kept a guiding hand on it
as long as he lived, although he relaxed it some in
his final days.   He continued to give the plant the
benefit of his financial prestige and business acumen
after the title passed as well as before.   He was
anxious, as all fathers are, to see his son succeed,
and he steadied George's hand to the last.   If these
things be kept in mind less trouble will be encountered
in understanding the inconsistent things offered to this
theory.    The important conversations, events, and
book entries point unmistakably to December 31, 1914,
as the date upon which Mr. Burt considered the title
had passed, and we hold that it did pass on that date.
If the title passed to George on that date, it follows
that whatever deposits were made after that date
would belong to him less what sums he had withdrawn.

It must not be overlooked that George, the donee,
had possession of the intended gift.   Under such cir-
cumstances, to show delivery, it is only necessary to
show that the donor relinquished dominion over the
thing given, and recognized the possession of the
donee as being in his own right.   *Miller* v. *McMechen*,
6 L. R. A. 515; *Tenbrook* v. *Brown*, 17 Ind. 410; *Wing*
v. *Merchant*, 57 Me. 383; *Gill* v. *Strozier*, 32 Ga. 688;
20 Cyc. p. 1197; 28 C. J. p. 638.

In the last citation the rule is stated:

"Where property is at the time of the gift in the
possession of the donee, as agent for the donor or other-
wise, it is not necessary that the donee should sur-
render to the donor his actual possession in order that
the latter may redeliver it to him in execution of the

gift, but a relinquishment by the donor of all dominion over the property, and recognition of the possession of the donor as being in his own right, is sufficient to perfect the gift."

"Surrender does not necessarily and always mean the actual, physical giving up. of possession of the instrument; hence it is not always the case that a deed retained in the grantor's hands is invalid for want of delivery. There may be such attendant circumstances as, for example, *relationship of grantor to grantee,* or other acts of the grantor besides the mere signing and sealing of the deed, as to show that the title is beyond his control, *though the deed is retained in his possession.*" Brewster on Conveyancing, § 298.

2. Defendant questions the jurisdiction of the equity court to entertain this proceeding. It insists if plaintiff has a valid claim for money deposited with his father he should have presented it to the commissioners (3 Comp. Laws 1915, § 13875). Not having done so it is barred by the nonclaim statute (§ 13877). Plaintiff answers this by saying he intended to present his claim to the commissioners on his father's estate, and should have done so except for the following circumstances: When ready to present his claim he had an interview with William T. Otis, his father's former secretary, and informed him that he intended to file a claim against the estate, and from him he learned that he did not place the deed and bill of sale to the plant in the tin box owned by himself and plaintiff on December 2, 1915. Without this proof plaintiff could not support his claim, and was obliged to abandon it. Some time later plaintiff discovered an affidavit the said Otis had made and filed with the Federal government to affect the question of income taxes, in which he stated that he did place said deed and bill of sale in said tin box belonging to affiant and plaintiff on December 2, 1915. By this time the estate was closed, so he began this action in equity for relief, claiming he had been prevented from filing his

claim by the fraudulent representation of one representing the estate.

Mr. Otis was appointed by the will to assist the trustee, and he was enjoined by the express terms of the will to give plaintiff information with reference to the estate. The fifth paragraph of the will reads as follows:

"I hereby appoint my private secretary, William T. Otis, who is familiar with the details of my estate, to assist the trustee and executor in the protection of the estate and the carrying out of the provisions herein contained. It is to be understood that the said William T. Otis shall not be required to devote his entire time to this matter, but only so much as the trustee and executor shall deem necessary, *or for detailed information required by George R. Burt, my son.* So long as said Otis shall consent to assist the trustee and executor he shall receive as compensation for his services the sum of four thousand dollars per annum, to be paid to him by the trustee and executor from the funds of the estate. Said Otis to have free access to all books, documents and records of the estate at any and all times."

This appointment placed upon Mr. Otis the duty of furnishing George, the plaintiff, with information concerning the estate, and its records, but instead of doing so he misrepresented the true facts to him. If Otis had made the same representation to George that he did in the affidavit the claim would have been presented to the commissioners. Plaintiff could make his claim in no other way, and was obliged to abandon it by reason of this fraudulent concealment upon the part of Mr. Otis, who represented the estate in giving this information to plaintiff. This was clearly a fraud upon the rights of plaintiff, and justifies the equity court in entertaining jurisdiction. *Second Nat. Bank of Saginaw* v. *Gamble,* 227 Mich. 31.

Plaintiff will recover whatever sums he sent his father after December 31, 1914, less what he may have

withdrawn during the time. The decree of the trial court may be modified in keeping with this opinion and affirmed. Plaintiff will recover his costs of both courts.

FELLOWS, WIEST, CLARK, McDONALD, and SHARPE, JJ., concurred.

The late Justice SNOW and Justice STEERE took no part in this decision.