H. D. SHELDEN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ALLAN SHELDEN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ALGER SHELDEN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

HENRY SHELDEN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ANNETTE S. STACKPOLE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ALLAN SHELDEN, ALGER SHELDEN AND HENRY SHELDEN, TRUSTEES, ROBINSON TRUST, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 33067, 41823–41828.   Promulgated December 30, 1931.

*Ferris D. Stone, Esq., Maxwell E. Fead, Esq., G. Bowdoin Craighill, Esq.,* and *Caesar L. Aiello, Esq.,* for the petitioners.

*L. A. Luce, Esq.,* and *F. L. Van Haaften, Esq.,* for the respondent.

6

8

OPINION.

LANSDON: Section 202 (a) (2) of the Revenue Act of 1921 provides that gain or loss from the sale or other disposition of property acquired by gift after December 31, 1920, shall be computed upon the same basis which the property would have had in the hands of the donor or the last preceding owner by whom it was not acquired by gift.. If the petitioners' contention that H. D. Shelden made a valid gift of the Rosedale Park property to his children on or before November 3, 1920, is correct, the basis for computing gain or loss upon sale of the property is the fair market price or value at the date acquired by the donees. Art. 1562, Regulations 45. The respondent contends, however, that no valid gift was made prior to May 31, 1923, when deeds to the property were executed, delivered and recorded.

The principal elements of a gift are: (1) An intention on the part of the donor to absolutely and irrevocably divest himself of the title, dominion and control of the subject at the very time he undertakes to make the gift; (2) the irrevocable transfer of the present title, dominion and control of the thing given by the donor; and (3) the delivery, by the donor to the donee, of the subject of the gift or of the most effectual means of commanding the dominion of it. *Allen-West Commission Co.* v. *Grumbles,* 129 Fed. 287. We have found, in the instant case, that on October 1, 1919, H. D. Shelden secured consent of the Grand River Avenue Development Company to assign his interest in the land contract of June 18, 1919. On August 3, 1920, he executed and delivered an assignment to each of his four children covering a portion of his interest in the land contract with the Grand River Avenue Company. The four assignments together covered his entire interest under such contract. Thereafter, and prior to December 31, 1920, he executed assignments of his interest as vendor in contracts covering lots sold, attached them to the particular contract and delivered it to the donee child. The purchaser's contract

was then stamped to show the assignment and the lot book, ledger sheet, etc., were stamped with the name of the donee child. On November 3, 1920, Shelden executed and delivered to his children an instrument referred to in the record as the family agreement, in which he conveyed his interest in the Grand River Avenue contract, the Bradley and Burger tracts and the 6-foot strip. On that date he also transferred the bank account for the enterprise to his children.

It is well settled in Michigan that a vendor's interest under a land contract is personal property, a mere chose in action, while the interest of the vendee is real property. *Hull* v. *Hostettler*, 224 Mich. 365; 194 N. W. 996; *Brown* v. *Lansing*, 129 Mich. 117; 88 N. W. 384. The claim of the vendor is an ordinary money debt, secured by the contract, and while he holds the legal title, the vendee is the owner in equity. *Walker* v. *Cosgrain*, 101 Mich. 604; 60 N. W. 291. In Michigan a valid gift of a chose in action, evidenced by an instrument in writing, may be made by a manual delivery of the instrument itself without any further writing, or by the delivery of a written assignment of the chose in action. *Hoyt* v. *Gillen*, 181 Mich. 509; 148 N. W. 163; and *Shepard* v. *Shepard*, 164 Mich. 183; 129 N. W. 201. All that was necessary to constitute a valid transfer of Shelden's interest as vendor in contracts covering lots sold was an expression by him to that effect, accompanied by a delivery of the thing to the donee.

As to the portions of Rosedale Park subdivisions which had not been sold under contract, we must determine whether the assignments of August 3, 1920, transferred the vendee's interest under the contract with the Grand River Avenue Development Company. A vendee under a land contract may transfer his equitable interest in the land by the delivery of an instrument of assignment. Such assignment would, of course, be subject to all the defenses which the vendor might make against the assignor. *Cutler* v. *Lovinger*, 212 Mich. 272; 180 N. W. 462; *Hickman* v. *Chaney*, 155 Mich. 217; 118 N. W. 993; and *Hull* v. *Hostettler*, *supra*.

The assignments of August 3, 1920, and the numerous assignments of particular lot contracts effectively transferred to the children all of Shelden's interest in the subdivision property, except the 10 acres which had not been platted, and that portion of the 6-foot strip and the Bradley and Burger tracts which remained unsold. The instrument of November 3, 1920, was a blanket conveyance to the children of every interest in the property which H. D. Shelden had, including the properties covered in the previous instruments. On November 3, 1920, Shelden also changed the New York bank account so that he

could no longer check against the funds belonging to the subdivisions. On November 3, 1920, Shelden had irrevocably divested himself of all title, dominion and control of the subdivision property, with the expressed intention of making a gift thereof to his children and he had made delivery of the subject to the donees. We think the gift was complete on November 3, 1920. Cf. *Burt* v. *Second National Bank of Saginaw*, 241 Mich. 216; 217 N. W. 71; and *Fischer* v. *Union Trust Co.*, 138 Mich. 612; 101 N. W. 852.

The respondent objects to the validity of the instruments of August and November, 1920, because they were not recorded and were not entitled to record. He argues that Shelden did not divest himself of all dominion and control over the property as long as he could have conveyed it to an innocent purchaser for value, who would have taken good title upon recording his deed.

Section 11770 of the Compiled Laws of Michigan (1915) provides:

Section 1. The People of the State of Michigan enact, That contracts for the sale of land or any interest therein, shall be executed in the presence of two witnesses, who shall subscribe their names thereto as such, and the vendor named in such contract, and executing the same may acknowledge the execution thereof, before any judge, or commissioner of a court of record, or before any notary public or justice of the peace within this state; and the officer taking such acknowledgment shall endorse thereon a certificate of the acknowledgment thereof, and the date of making the same under his hand.

Section 11773 provides that any contract executed and acknowledged according to the above provisions shall be entitled to be recorded in the office of the register of deeds of the county where the lands lie. The assignments of August 3, 1920, were subscribed by two witnesses, but were not acknowledged. The sticker assignments which were attached to the specific lot contract to be assigned were subscribed by one witness, but were not acknowledged. The family arrangement of November 3, 1920, was neither witnessed nor acknowledged.

Title to real estate, however, may be transferred in Michigan by instruments which are neither witnessed nor acknowledged. In *Kerschtensteiner* v. *Northern Michigan Land Co.*, 244 Mich. 403; 221 N. W. 322, the court stated:

Deeds of real estate, to be entitled to record, must be acknowledged, but an acknowledgment is not a part of the conveyance, *Brown* v. *McCormick*, 28 Mich., 219; *Livingston* v. *Jones*, Har. 165. Title to real estate may be transferred by conveyances not acknowledged. *Price* v. *Haynes*, 37 Mich., 487. Deeds in order to be recorded should be witnessed, but a deed not witnessed is good between the parties. *Fulton* v. *Priddy*, 123 Mich., 298, 82 N. W. 65; 81 Am. St. Rep. 201; *Carpenter* v. *Carpenter*, 126 Mich. 217, 85 N. W. 576; *Baker* v. *Clark*, 52 Mich. 22; 17 N. W. 225; *King* v. *Carpenter*, 37 Mich. 363; *Brown* v. *King*, 172 Mich. 355, 137 N. W. 729.

Cf. *Solomon Mier Co.* v. *Hadden*, 148 Mich. 488; 111 N. W. 1040; *Stamp* v. *Steele*, 209 Mich. 205; 176 N. W. 464.

An unrecorded land contract is not unusual and is not particularly significant in the instant proceeding. In many cases the record of title would be unnecessarily complicated by the recording of contracts, assignments and subcontracts where the relation of the parties insures safety and inspires confidence. We have found that the deeds executed and delivered in 1923 by Shelden and his wife to their children were part of a plan whereby a deed to the Rosedale property would be delivered by the Grand River Avenue Development Company directly to the children, without having the record title pass through H. D. Shelden and wife. At some time in the near future the petitioners knew that they would be required to furnish abstracts of title for each of the 1,041 lots which had been or would be sold. The record would be greatly shortened by not recording the contracts of sale, assignment, etc. When the balance of the purchase price was paid to the Grand River Company, they could then record the single deed from that company to the children which would give them a clear record title. The quitclaim deed from Shelden and his wife to the children eliminates any possibility of a cloud on the title in them.

The respondent alleges that if any transfer was effected by the instruments of August 3, 1920, it was by purchase and not by gift. He contends that the following language in each of the four instruments recites a valuable consideration which is sufficient to support a sale:

* * * In consideration of One Dollar ($1.00) and love and affection, I do hereby grant, sell and convey to * * * all my right, claim and interest in and to the annexed Land Contract bearing date the 16th day of June A. D. 1919 * * *

* * * And said [child's name], in consideration of the premises, hereby assumes and agrees to perform and carry out all parts of said annexed Land Contract (not already performed) therein provided to be performed by the party of the second part thereto so far as the same relates to the above described premises. * * *

We are not impressed with the respondent's argument. Reading the instrument as a whole, it is clear that a gift was intended by H. D. Shelden of his equity in the contract with the Grand River Avenue Development Company. That the donees in the instant case agreed to pay the balance of the purchase price does not change the character of the transfer from that of gift to that of purchase. Certainly one may make a gift of whatever interest he may have in property. And neither does the recital of " One Dollar ($1.00) and love and affection " determine whether the transfer was by gift or

by purchase. See *Fischer* v. *Union Trust Co.*, 138 Mich. 612; 101 N. W. 852; *Harry F. Robertson*, 5 B. T. A. 748.

The respondent alleges that if the Board should find there was a gift by H. D. Shelden to his children in 1920, and that the fair market value of the gift exceeded cost to the donor, then the difference between cost and the fair market value constitutes income to the petitioner, H. D. Shelden, for that year. He also alleges that if the Board should find there was a gift in 1920 of certain installment contracts receivable, then all of the unreported profit from the sale of lots under such contracts was realized at the effective date of the gift and is taxable to H. D. Shelden for 1920. Similar questions have been raised before this Board in *Wallace Huntington*, 15 B. T. A. 851; *M. A. Milan*, 16 B. T. A. 1112; and *Charles F. Meagher*, 20 B. T. A. 68. In the *Huntington* case, we considered at length the questions whether there was a realization of taxable income by a donor at the time he effected a gift of installment obligations, and whether a tax could be imposed upon the donor in years subsequent to the gift when the donees collected payments under the contract. We held that the donors were not taxable in 1922 and 1923 upon the profit contained in installments collected in those years by the donees. There the gift occurred in 1921, and while that year was not before the Board, we stated, after discussing the controlling statutes, " that petitioners [the donors] were not in receipt of income when they received the notes in question and when they gave them to their children." In the *Milan* case we held that a donor of an installment contract receivable realized no taxable income upon a gift to his wife and children of the installment obligation. In the *Meagher* case we stated:

* * * In the present case petitioner has disposed of his deferred payment obligations in an exchange which, under the specific provision of the taxing statute, can not be considered as effecting a realization of a taxable gain. The situation here presented resembles more closely those cases in which certain deferred payment obligations under sales made upon the installment basis were by the owner disposed of by gift, and in which we held that, having disposed of such obligations and the collection thereof being by the donee and being his property when collected, the donor could not be considered as in receipt of income in respect thereof, either in the year in which the gift was made or when such installments were collected by the donee. *R. L. Brown*, 14 B. T. A. 609; *Wallace Huntington*, 15 B. T. A. 851; *M. A. Milan*, 16 B. T. A. 1112.

We can but conclude that the transfer by petitioner of these installment obligations in a transaction which under existing law is held not to result in taxable gain can not be considered as a present realization of income therefrom, and this conclusion is further strengthened by the fact that the determining of a taxable gain from such a transaction is first provided for by the Revenue Act of 1928, in section 44 (d). * * *

We think our conclusions in the above cases are applicable here and hold, accordingly, that H. D. Shelden realized no taxable income when he gave the installment contracts receivable to his children.

In determining the tax liability of the donee children, the respondent has computed profit upon the same basis the property had in the hands of the donor. He has, then, taxed the donees on the profit contained in each installment payment as computed for the donor. The basis for computing gain or loss in the hands of the donee children is the fair market price or value at the date of acquisition. Art. 1562, Regulations 45. The percentage of profit contained in each installment payment, as computed for the donor, is not income to the donee in so far as such profit is included in the fair market value of the property; it is part of the gift.

It remains for us to determine the fair market value of the gifts to the children at the effective date. The property transferred is of two general classes, namely, the vendor's interest under land contracts covering lots sold, and the unsold lots. The petitioners contend that the contracts, which drew interest at 6 per cent, had a fair market value equal to the balance due thereon and that the fair market value of the unsold lots was the price at which they were offered for sale.

The petitioners, Alger and Henry Shelden, testified that in their opinion the property received from H. D. Shelden by the children had a total net value of $1,576,481.04, which value was arrived at by adding the total balance due on land contracts receivable of $1,556,233.12, to the total selling price of the unsold lots in the amount of $1,333,919, plus the acreage value of the unsubdivided 10-acre tract, and deducting the balance of commissions due on lots sold of $135,120.51, 5 per cent of both the contracts receivable balance and the unsold lots price as a discount for cash, 15 per cent of the unsold lots figure as sales commission, 5 per cent of the contracts receivable balance and the unsold lots price for costs of collection, the cost of uninstalled improvements in the amount of $557,892.96, and the balance due on the land of $242,947.60. To such result they added cash on hand of $14,485.68, an account receivable of $150.79, and the cost to date of buildings under construction on the property of $83,754.74.

The petitioner's witness, Clarkson Wormer, who had participated in the subdivision and sale of several properties similar to that involved herein, testified that while the Rosedale Park project had a value of $1,556,233.12 to the subdivider, who would hold the contracts and continue the sale of lots, the two subdivisions consisting of the unsold lots and the land contracts covering lots sold could have been sold for $1,000,000 in the latter part of 1920. Another

expert witness called by the petitioner testified that in his opinion the Rosedale Park subdivisions were worth par, by which we understand that he meant that the sales contract and the unsold lots were respectively worth their face value and the asking prices.

The respondent called two expert witnesses who had been extensively engaged in the subdivision business in Detroit. Frank S. Pieper testified that a depression existed in the real estate subdivision business in 1920, and that in his opinion the Rosedale Park properties had a fair market value in the latter part of 1920 of no more than the acreage value of the underlying land. The respondent's witness, Thomas Hinchman, testified that in his opinion the property had a fair market value of $2,000 per acre, plus the cost of improvements installed and less the balance due to the Grand River Avenue Development Company on the purchase price.

We think the Rosedale Park subdivisions were worth substantially more than the fair market value of the underlying acreage on November 3, 1920, when the gift of the enterprise was completed. At that time plans for development had been completed, improvements had been installed, the subdivision had gained public favor in Detroit, as evidenced by sales of 60 per cent of the lots, and there was every reason to believe that the remaining 40 per cent of the lots could be sold at or near the price asked. On the other hand the value contended for by the petitioners as contained in the testimony of Alger and Henry Shelden is based on a prospective element which we think must be eliminated in determining the fair market price or value at the basic date. To realize the value contended for by them would require that they hold the subdivisions as a business enterprise until they had been completely liquidated.

After careful consideration of all the evidence, we think the fair market price or value on November 3, 1920, of H. D. Shelden's interest in Rosedale Park Subdivisions Nos. 2 and 3 was $1,000,000, exclusive of the unsubdivided 10-acre tract, the cost of buildings under construction, and cash on hand or accounts receivable. This figure should be allocated on a percentage basis between land contracts receivable and unsold lots in proportion to the total unpaid balance of the former and the total asked price of the latter. The fair market price or value of the unsubdivided 10-acre tract was at least $13,000 at that date.

The record contains several voluminous exhibits showing figures relative to the sale of lots, repossession of lots, collections, and many other facts necessary to a recomputation under Rule 50. We have not encumbered this report with findings of fact from such exhibits, since such facts are not necessary to a determination of the issues raised. They are necessary, however, to a recomputation under Rule 50, and will be referred to in making such recomputation.

The petitioners allege in their amended petition that the respondent made numerous errors in taking figures from the books kept for the Rosedale Park subdivisions. There is no allegation in particular of the errors complained of, and while the record contains an exhibit consisting of transcripts from the books, we do not feel obliged to search out errors under such a general allegation. If the parties see fit to correct the errors under Rule 50, we have no objection.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

TRAMMELL dissents.

---

STERNHAGEN, concurring: While the decision is, in my opinion, entirely unfair, I see no escape from it under the law which governs it. The spreading of gains from installment sales over the years of payment was a privilege granted to afford relief from the ordinary system of taxing the gain at the time of the transaction. Cf. *B. B. Todd, Inc.*, 1 B. T. A. 762. Such relief ought in fairness to carry with it the obligation that by no device will the tax, which, but for the relief, would have been paid, be frustrated. The earlier statutes provided no such obligation and no considerations of general fairness empower the Board to impose it. According to a cardinal rule, taxes may not be imposed by implication, no matter how strong, and therefore the statute may not by construction be regarded either as permitting the disregard of the transfer by the donor or applying to the donees the basis which would have been applied to him, or as taxing him for the income which came to them, or as treating the disposition by gift as a realization of the gain. The intimations in *Irvin* v. *Gavit*, 268 U. S. 161, and *Taft* v. *Bowers*, 278 U. S. 470, that the tax is upon income, notwithstanding change of ownership of the corpus from which it is derived, are, in view of other cases like *Poe* v. *Seaborn*, 282 U. S. 101, and *Hoeper* v. *Tax Commissioner of Wisconsin*, 284 U. S. 206, not sufficient to give assurance that this theory is to be taken as a general principle of the income tax.

By the Revenue Act of 1928, section 44 (d), an attempt has been made to provide for such cases, but this was not made retroactive.