LEO N. LEVI MEMORIAL HOSPITAL ASSOCIATION *v.*
CARUTH, ADMINISTRATOR.

4-8462                                        208 S. W. 2d 983

Opinion delivered March 8, 1948.

*Scott Wood* and *Leland F. Leatherman,* for appellant.

*Mallory, Rasmussen & Johnson; Wootton, Land & Matthews* and *Fulcher & Fulcher,* for appellee.

GRIFFIN SMITH, Chief Justice. From a judgment in favor of Jack Caruth, administrator of the estate of Joseph Bailie, directing Leo N. Levi Memorial Hospital Association at Hot Springs to surrender designated securities, the defendant has appealed.[1]

Bailie, seventy-four years of age, died at the Hospital February 16, 1947—six days after entering. Although a native of Georgia, the patient had for many years resided in Arizona at Mesa.

Litigation resulting in this appeal had for its purpose determination of ownership in respect of $91,000 in United States bonds.

When Bailie reached Hot Springs by bus he had two suitcases; and he carried a paper carton containing food and table utensils. After engaging in arguments with a taxicab driver regarding the fare, he was taken to police headquarters and booked for the night as a vagrant. The following morning Bailie called upon the proprietor of a local pharmacy—a man he had known for many years. The two went to Dr. E. R. Browning's office, where Bailie's illness was diagnosed as asthma, with coronary complications. Following futile efforts by telephone to procure hotel accommodations, a taxicab was called. Wilbur Ragsdale, the driver, was first directed to take Bailie to the bus station. Through use of two baggage checks the suitcases were recovered, then considerable time was spent in an endeavor to find lodging in acceptable quarters where charges would not exceed $1.50 per day.

Ragsdale as a witness said that after several discouraging experiences Bailie asked where the Hospital was, then directed that he be taken there. He had formerly written the Chamber of Commerce, and the letter had been referred to the Hospital, resulting in a communication from Bailie to the institution in which he stated that he would like to get "some dope on your hospital".

Upon arriving at the Hospital Bailie told Miss Regina Kaplan, the superintendent, that he wanted to stay there two days and see how the Hospital was con-

---

[1] By answer and cross complaint it was shown that the bonds were held by the Arkansas Trust Co., a local banking institution.

ducted. He understood that it was operated in the interest of charity. Import of Bailie's statements is that if satisfied regarding nature of the Hospital's humanitarian purposes, he would assist it financially. Several young lady employees overheard some of the comments made by Bailie. Their versions of what was said vary but slightly. Expressions were, (1) "He wanted to give us some of his money"; (2) "Let me give you my money first"; (3) "He said he had a lot of money he wanted to leave with the Hospital"; (4) "I want to stay here several days, and if I like it I will give you some of my money"; (5) "If you will take care of me I will take care of you"; (6) "I want to leave my money with the Hospital"; (7) "You have a fine institution here. . . . If I should give you all that property of mine you now have, would you use it for the poor? . . . I like how you treat these poor people: take it—I want you to go on with your work".

All of the witnesses who mentioned the subject agreed that Bailie was somewhat deaf and talked loudly; hence snatches of what he said were overheard, although none of the interested parties or those later used as witnesses had any idea at the time Bailie was speaking that he actually possessed wealth or that he intended to make a donation.

Bailie was taken to a room in the fifth ward. Miss Imogene Word, student nurse, took the patient's history and made an inventory of personal belongings. Her testimony was that these included a large black suitcase and a smaller one; also "lots of bundles that contained old food that I threw away". The large suitcase contained a bathrobe and other clothing. Miss Word observed a brown envelope upon which had been written "U. S. Bonds", or something to that effect. The envelope was not opened, nor was any further attention given to it when Bailie said he wanted it taken to the office. Another nurse assisted in an examination of the small suitcase, after which both containers were taken to the baggage room on the third floor; and the bonds went with them.

Miss Word testified that she did not mention to the superintendent that one of the cases contained an en-

velope marked bonds. On cross examination she was asked, "Did you make an inventory of [the patient's] effects?" She replied, "I didn't put the bonds down there". Her first actual information regarding content of the envelope came after Bailie died.

Miss Kaplan testified that while administering professionally to the patient, Bailie remarked, "I have come here for you to take care of me. I have got my money here and I want to give you money".

The following day Miss Kaplan again visited Bailie. He had been bathed, and appeared to be in better condition. In response to the salutation, "How do you feel?" the patient is quoted as having said, "I am feeling better. I see how you are treating these poor people. I feel good that I have given you that money: you will be able to do a lot with it". Miss Kaplan said she replied, "Yes, that is the nicest gift we ever had", and Bailie's response was to the effect that he had been wanting to do it for a long time.

The patient's death occurred Sunday morning. Miss Kaplan had an engagement in Little Rock, but before leaving the Hospital she gave instructions that Bailie's body be sent to Caruth's Funeral Home to be embalmed and prepared for shipment. Miss Kaplan knew the suitcases were in the Hospital baggage room, but testified that "All I knew about [anything] of any value was the $368: I thought the gentleman was referring to that during all of the time, and I thought that represented a fortune to him, and so far as we were concerned I thought it was a generous gift on his part".

Caruth's hearse was sent to the Hospital. Bailie's body was found in a room where oxygen had been administered. The suitcases were in the same room. Miss Kaplan was present when the body was removed. A nurse in charge directed that the undertaker's employees "be sure to take everything". Miss Kaplan assured the attendants she would communicate with Caruth the following day and make such arrangements as might be necessary for disposal of the corpse. After the body had been embalmed, Caruth and two of his aids opened the

suitcases and found the bonds. An attempt was made to communicate with Miss Kaplan, but she was not found until Monday afternoon. She then went to Caruth's office, received the securities, and signed a receipt for a "List of bonds belonging to Joseph Bailie, deceased".

It is intimated, but not asserted, that someone connected with or interested in the Hospital altered the receipt prepared by Miss Word, although no suspicion attaches to her; nor was there any purpose by appellee to identify a particular person, there being no proof that any of the immediate personnel—nurses, superintendent, etc.,—was a party to an improper transaction. However, when the receipt was taken from Hospital files there had apparently been added to the inventory these words: "One package containing papers and bonds. Patient requests that these be given to Administrator". Bailie's name had been written twice. One signature showed evidence of erasure, or a "marking through".

Appellee's witnesses thought the interlined words were so closely written as to disclose an afterthought. Since Miss Word, in identifying the inventory, testified that she "did not put the bonds down there", and because Miss Kaplan did not (during Bailie's lifetime) know that the bonds existed, responsibility for the reference to them was not traced to any conscious act of Bailie, hence there is no showing that he authorized the writing. Neither have we the benefit of physical inspection. Unfortunately the inventory was misplaced, and only a typewritten copy appears. When attorneys for appellee discovered the loss, testimony was taken in support of a motion to postpone approval of the bill of exceptions until the lost document could be restored or its significance made a matter of record. That part of the motion proposing postponement was overruled, but not until testimony had been heard. It is incorporated in a supplemental bill of exceptions.

To show that Bailie had a general intent to leave his property to a charitable institution like Levi Memorial Hospital, the plaintiff introduced a will executed January 4, 1947. It had been admitted to probate in Rich-

mond County, Georgia. Certain small bequests (the largest being for $1,000) were made to individuals. Then there was direction that "all the rest and residue" be entrusted to Citizens and Southern National Bank, two cousins, and a friend. These, as trustees, were told to select, as soon as practicable, but not later than five years after the testator's death, ". . . the particular hospital or hospitals [the trustees], in the exercise of their uncontrolled discretion, shall [think] best fitted and equipped to receive, manage, and utilize the property of the trust estate for the charitable purposes herein expressed. . . ."

In addition to the bonds, Bailie owned considerable property, but appellant does not contend that the so-called gift passed anything but the money, and securities itemized by Caruth.

The motion for a new trial lists seventeen mistakes the Court is alleged to have made. These are summarized by counsel for appellant in their contention that, although there were factual questions for the jury's consideration, erroneous instructions were prejudicial.

Whether the rule applicable to gifts *inter vivos* or to gifts *causa mortis* is applied, appellant insists it should prevail to the extent of a reversal of the judgment with an order that the cause be retried.

It is first argued that Bailie effectively delivered the property by surrendering all dominion over it; also that there was acceptance by Miss Kaplan as agent of the Hospital Association. "Having", as appellant's attorneys have expressed it, "sampled the generosity, kindness, and efficiency of appellant's nurses and physicians, [Bailie] may have figured that he could find no safer haven. The charts in the envelope made exhibits to Miss Kaplan's testimony show that he received all the attention that a millionaire would have received at Johns Hopkins Hospital". It is then contended that the transaction contained all of the elements to support a gift *causa mortis*. But, it is said, Miss Kaplan construed the gift as having been made in anticipation of death, for her testimony was that if Bailie had recovered, or if he

had left the hospital in any circumstances and had requested return of the suitcases, they would have been given to him, and so would the money. Cases cited in support of appellant's theory are listed in the margin.[2]

Appellant conceded that three of the instructions "correctly and fully" stated the law, but thinks error was committed when certain expressions were used in Instructions 2, 3, 4, 5, 6, and 7. In substance the jury was told that *actual* delivery was essential to a completed gift, made in anticipation of death, and that intent to presently pass title must exist at the time of delivery. Again, it is argued that if the subject matter of a donor's bounty is knowingly placed within a container, and physical delivery of the container is consummated, it is not essential to a completed gift subsequently made that the property be again delivered.

Instruction No. 5 is the principal target of appellant's attack. It alternatively deals with gifts *causa mortis,* and *inter vivos.* After mentioning and defining, the instruction says that in either case designation must be with distinctness, ". . . and it must also be established that the property was presently to pass, and that the intention was carried into effect by an actual or effective delivery. Delivery before death is as essential to a gift *causa mortis* as it is to a gift *inter vivos,* and the same rules as to delivery are applicable to both".

Essentials of a gift *causa mortis* were stressed in *Newton et al.* v. *Snyder, Adm'x.,* 44 Ark. 42, 51 Am. Rep. 587, where Chief Justice COCKRILL, in speaking for the Court, said that in order to establish such a gift it is essential the evidence show "not only that the person *in extremis* designated with proper distinctness the thing

[2] *Ammon* v. *Martin,* 59 Ark. 191, 26 S. W. 826; *Hatcher* v. *Buford,* 60 Ark. 169, 29 S. W. 641, 27 L. R. A. 507; *Lowe* v. *Harb,* 93 Ark. 548, 125 S. W. 630; *Gordon* v. *Clark,* 149 Ark. 173, 232 S. W. 19; *Carter* v. *Greenway,* 152 Ark. 339, 238 S. W. 65; *Ellsworth* v. *Carnes,* 204 Ark. 756, 165 S. W. 2d 57; *Anderson* v. *Lord,* 87 N. H. 474, 183 Atl. 269, 103 A. L. R. 1108, note at p. 1111; *Northern Trust Co.* v. *Swartz,* 309 Ill. 586, 141 N. E. 433; *In re Mills Estate,* 172 App. Div. 530, 158 N. Y. S. 1100, affirmed 219 N. Y. 642, 114 N. E. 1072; *Laig* v. *Pelus,* 198 Miss. 185, 22 So. 2d 239; *Burt* v. *Second National Bank,* 241 Mich. 216, 217 N. W. 71; *Champney* v. *Blanchard,* 39 N. Y. 111; *Caylor* v. *Caylor,* 22nd Ind. App. 666, 52 N. E. 465, 72 Am. St. Rep. 331; *Cain* v. *Moon,* (1896) 2 Q. B. 283.

8

to be given and the person who is to receive it, but it must establish also that the property was presently to pass, and that the intention was carried into effect by an actual or effective delivery. In this respect there is no difference between gifts *inter vivos* and *causa mortis.*"

In *Hatcher* v. *Buford,* 60 Ark. 169, 29 S. W. 641, 27 L. R. A. 507, the two classes of gifts were considered. It was held that a husband's attempt to convey property *causa mortis* was subject to the widow's right of dower. The opinion holds the better rule to be that although delivery has been made, property rights do not become vested until the donor's death, ". . . that is, the donor's death is a condition precedent to the vesting of title." The same rule was mentioned in *Ammon* v. *Martin,* 59 Ark. 191, 26 S. W. 826—two of the cases cited by appellant. Both are referred to in *Harmon* v. *Harmon,* 131 Ark. 501, 199 S. W. 553, also cited by appellant.

Of the instructions complained of, only No. 5 expressly mentions gifts *causa mortis.* Nos. 4 and 6 use the term *"inter vivos",* and Nos. 2, 3 and 7 employ other words.

If it be conceded that *Hatcher* v. *Buford, Ammon* v. *Martin,* and *Harmon* v. *Harmon* modified the rule announced in *Newton* v. *Snyder,* and that error would have been committed if "immediately", or "simultaneously", or "at once" had lent emphasis to Instruction No. 5, the fact remains that this was not done. Instead, the jury was told it was incumbent upon the plaintiff ". . . to establish that the property was *presently* to pass, and that the intention was carried into effect by an actual or effective delivery".

Word references disclose that "presently" has two meanings: (1) "Now, at the time spoken of"; (2) Immediately; by and by; in a little time". See Century Dictionary. "Him therefore I hope to send presently, so soon as I shall see how it will go with me".—Paul's Epistle to the Philippians, 2:23.

Appellant's specific objection to Instruction No. 5 is not a contention that "presently" was an improper

expression because it meant *now,* or *immediately;* therefore, since the use of the word as a period of time is not of necessity limited to the restricted construction appellant contends for, it cannot be said that the jury was misinformed.

If the jury regarded as genuine the matter relating to bonds, interlined on the inventory prepared by Miss Word, it had a right to determine the sense in which "Administrator" was used, the request being that " . . . these [bonds] be given to the Administrator". If mentally capable of making testamentary decisions at that time, Bailie knew, of course, that he had recently executed a will, and that his affairs would pass through administration. Appellant introduced witnesses who testified that Miss Kaplan, the superintendent, was spoken of as Administrator, and that perhaps Bailie knew this and had her in mind when the wish was expressed—if in fact the act was a conscious one. But in any event construction of the language was a disputed question. If Bailie intended that the bonds should go to a legal representative— "Administrator"—after his death, that purpose was in conflict with appellant's contentions that either a completed or conditional gift was made.

While the case presents many unusual phases, our view is that appellant was not prejudiced by the instructions. Factual issues were adversely determined by a jury, and we are unable to say that appellant was denied its legal rights.

Affirmed.